# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 07-CR-0508 (JFB) (MLO)
_____

## UNITED STATES OF AMERICA,

versus

## CARMINE GRAZIANO,

Defendant.

_____

MEMORANDUM AND ORDER
March 20, 2008
_____

JOSEPH F. BIANCO, District Judge:

The Indictment charges the defendant, Carmine Graziano, with crimes related to an arson of Roseanne's Cards Galore ("Roseanne's") in New Hyde Park, New York on August 11, 2003. In connection with that Indictment, the government alleges that Graziano ordered the August 11, 2003 fire at Roseanne's because of a several year dispute between the owners of Roseanne's and the defendant, who owned a tavern named "Copperfield's" located next door to Roseanne's. The government further contends that the arson was in retaliation for complaints by the owners of Roseanne's, Joseph and Anna Graham (hereinafter, the "Grahams") to local law enforcement, as well as municipal and state regulatory authorities, regarding late night noise, violence, and underage drinking at Copperfield's.

Defendant moved, pursuant to Rules 404(b) and 403 of the Federal Rules of Evidence, for the suppression of the fruits of the search of defendant's home and computer. The government moved, *in limine*, to introduce evidence, in its case-in-chief, of the following prior bad acts of the defendant: (1) a series of prior interactions between the defendant and the owners of Roseanne's, including threats which the defendant allegedly made to the owners; (2) the defendant's unsuccessful attempt to have the owners assaulted; and (3) illegal gambling inside the defendant's bar. Defendant argues that the evidence should be excluded under Rules 404(b) and 403. In addition, the Government moved *in limine* (1) to preclude any examination or testimony regarding the defendant's offer to take a polygraph examination; and (2) to preclude any examination or testimony regarding the term of imprisonment associated with Title 18, United States Code, Section 924(c)(1)(b)(ii), which is the charge contained in Count Three of the Indictment.

The Court ruled on these motions orally and stated that this more detailed written opinion would follow.[1] For the reasons set forth below and orally on the record in Court, (1) the defendant's motion to suppress is denied; (2) the government's motion *in limine* to admit certain evidence is (a) granted as to the evidence regarding the prior interactions between defendant and the owners of Roseanne's (including the alleged threats), as well as the alleged unsuccessful attempt to have the owners of Roseanne's assaulted; and (b) denied as to the illegal gambling evidence; and (3) the government's motion *in limine* to preclude evidence regarding defendants's offer to take a polygraph and any reference by defense counsel during the trial regarding the penalties for Count Three is granted.

## A. Search of Graziano's Home

The defendant moved to suppress the evidence seized from his home in its entirety because the search was an unlawful "general search" conducted in flagrant disregard of the search warrant. The Court disagrees and finds that there is no basis to suppress the seized evidence as part of an unlawful general search, or on any other grounds.

### 1. The Facts[2]

On July 13, 2004, law enforcement agents conducted a search at defendant's house in Oceanside, New York, pursuant to a warrant issued earlier that evening by Judge Donald E. Belli of the Nassau County Court. The warrant authorized the agents to search for, and seize, gambling records and/or other paraphernalia used in illegal gambling activities, including records electronically stored in computers. Specifically, the warrant allowed seizure of the following:

> records of bets, accounts and transactions, including betting slips, made in the course of illegal bookmaking activity, whether written or electronically recorded on paper or in a computer or computer program; adding machines, calculators, computers and other equipment used and possessed for use in recording and tabulating bets, wagers, odds, commissions, losses, winnings, collections and

---

[1] On March 5, 2008, after a jury trial, the jury returned a guilty verdict on all three counts contained in the Superseding Indictment.

[2] Although defendant initially requested a hearing regarding the facts and circumstances surrounding the search of defendant's residence, the parties agreed at oral argument that such a hearing was unnecessary because the government stated that it was not disputing any of the facts regarding the scope and duration of the search on July 13, 2004 asserted in defendant's moving papers – namely, that law enforcement searched each room for gambling records over a three-hour period. Therefore, the Court determined that the legal issue could be decided based upon the defendant's undisputed version of the facts, which was contained in defendant's papers and is summarized below.

disbursements involved in the course of illegal bookmaking activity, FAX machines, address books and notations of telephone numbers, tape recorders, answering machines and tapes or discs; safes, United States currency and other proceeds of illegal gambling activity, financial records, including but not limited to documents relating to deposits or withdrawals of sums of money from savings and checking accounts, telephones, wireless telephones and pagers, including the information electronically stored therein, any property or record which tends to identify a particular person as having control or access to a particular premises or location, keys to safe deposit boxes, all said property used and possessed for use in furthering illegal gambling activity, and for any of the above-listed property or evidence contained in closed containers . . . .

(Weiss Aff., Exh. A.) The basement of the house contained an office area with a desk, computer, fax machine, business telephone and file cabinets. During the search, an alleged betting slip was recovered from this basement area, as well as the computer and fax machine. (Joann Graziano Aff. ¶ 6.) The officers also searched the remainder of the house for approximately three hours – including the bedrooms, bathroom, kitchen, and laundry room – for other items within the scope of the warrant. (*Id.* ¶ 7.) A gambling

record also was found on a dining room table. (Weiss Aff. ¶ 4 n.1.) During that search, the agents also found an antique pistol, two stun guns, and two switchblade knives in a bedroom closet and seized those items. (Joann Graziano Aff. ¶ 8; Weiss Aff. ¶ 7.)

2. Analysis

Under well-settled Second Circuit case authority, "[g]overnment agents 'flagrantly disregard' the terms of a warrant so that wholesale suppression is required only when (1) they effect a 'widespread seizure of items that were not within the scope of the warrant,' . . . and (2) do not act in good faith." *United States v. Liu,* 239 F.3d 138, 140 (2d Cir. 2000) (quoting *United States v. Matias,* 836 F.2d 744, 748 (2d Cir. 1988)) (citations omitted). As the Second Circuit has noted, "[t]he rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search." *Liu,* 239 F.3d at 141 . Therefore "to satisfy the first prong of the two-part test described above, the search conducted by government agents must *actually resemble* a general search." *Id.* Thus, "the extreme remedy of blanket suppression should only be imposed in the most extraordinary of cases." *United States v. Foster,* 100 F.3d 846, 852 (10th Cir. 1996) (internal quotation marks omitted).

In support of his argument, Graziano contends that the searchers acted in flagrant disregard of the warrant because they did not limit themselves to the basement of the house, which contained an office area, but rather searched all of the rooms in the entire house for such records over a three-hour period. The Court finds this argument unpersuasive. It is clear from the warrant that the searchers

were permitted to go into every room. The reason for the scope of the warrant is clear – gambling records can easily be hidden in any area of a residence by the occupant of that residence. When looking for such records, law enforcement is not required to limit itself only to areas, such as desks or filing cabinets, where documents for non-criminal purposes are generally stored. It would defy logic to conclude that criminals would limit themselves to such customary storage containers, rather than attempting to conceal records of criminal activity in other more obscure places. *See United States v. Riley,* 906 F.2d 841, 845 (2d Cir. 1990) ("[T]he Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category.").

The Supreme Court has stated that "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross,* 456 U.S. 798, 820-21 (1982). Thus, when authorized by the warrant, courts have repeatedly upheld the ability of law enforcement officers to search an entire home for items within the scope of the warrant. For example, in *United States v. Canestri,* 518 F.2d 269, 273 (2d Cir. 1975), the Second Circuit rejected an argument that the police had exceeded the scope of a search warrant and upheld the search of a storeroom where the warrant permitted a search of the entire house. Specifically, the Second Circuit explained:

> The warrant directed that the entire house be searched. As the district court noted, to exclude the storeroom from the scope of the warrant "on the facts of this case, would be to suggest that the purposes of a search warrant could be frustrated by the mere declaration of the owner of a one-family residence that one of the rooms therein 'belongs' to a party not named in the warrant. . . . Such a result would clearly be inappropriate.

*Id.* at 273 (citation omitted). Similarly, in *United States v. Ayers,* 924 F.2d 1468 (9th Cir. 1991), the Ninth Circuit held that "[a] search warrant for the entire premises of a single family residence is valid, notwithstanding the fact that it was issued based on information regarding the alleged illegal activities of one of several occupants of a residence." *Id.* at 1480 (citations omitted); *see also United States v. Waters,* 786 F. Supp. 1111, 1119 (N.D.N.Y. 1992) (finding that agent "was justified in believing that defendant had control of the entire premises such that the subject of the search warrant could be located anywhere in the residence, outbuildings, or appurtenances thereto, and [the agent] had probable cause to search the entire premises"); *United States v. Maher,* No. 94 Cr. 606 (LLS), 1995 WL 258194, at *3 (S.D.N.Y. May 2, 1995) ("Because the warrant authorized a search of the entire residence and seizure of documents identifying co-conspirators, the seizure of [defendant's] diaries and appointment books, regardless of their location or purported personal nature, was justified."). Thus, the search of all the rooms in Graziano's home for gambling records over the three-hour period was completely consistent with the warrant and does not provide any basis for concluding

that the officers conducted a general search.

Defendant's second assertion – namely, that officers exceeded the scope of the warrant by seizing the pistol, stun guns, and knives in the bedroom – is equally unavailing. The Supreme Court has held that "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Payton v. New York,* 445 U.S. 573, 587 (1980). "Under [the plain view] doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson,* 508 U.S. 366, 375 (1993). In the instant case, as noted above, the officers were permitted to search the closet for gambling records that could be seized pursuant to the warrant and, when they observed these weapons in plain view during such search, the officers were authorized to seize them. In particular, in New York State, possession of certain weapons – including pistols, switchblade knives, and electronic stun guns – is a crime. *See* N.Y. Penal Law § 265.01. There are exceptions to this law, including for possession of pistols for those who possess a valid license for that particular weapon (N.Y. Penal Law § 400.00(7)), as well as for possession of switchblades for those who have a valid hunting license (N.Y. Penal Law § 265.20(a)(6)). Although defendant argues that the seizure was improper because there was no indication to the police that the weapons were illegally possessed, the Court rejects that contention under the circumstances of this case and finds that the police officers were allowed to seize such weapons prior to determining whether they were illegally possessed.

First, the police had no reason to believe that defendant's possession of an electronic stun gun fell within the narrow exceptions (such as for use by law enforcement) to the New York laws which criminalize such possession and its incriminating nature was immediately apparent. *See, e.g., United States v. Cruz,* 314 F. Supp. 2d 321, 332 (S.D.N.Y. 2004) (holding seizure of stun gun in plain view was proper under Fourth Amendment). Similarly, there was probable cause to believe that these other weapons in plain view were associated with criminal activity, despite the fact that there was the possibility that defendant had a license for the gun and switchblades, especially when the stun guns were in close proximity with other weapons. *See, e.g., United States v. Rudaj,* 390 F. Supp. 2d 395, 402 (S.D.N.Y. 2005) (holding seizure of two guns in plain view in bedroom during protective sweep was permissible); *United States v. Corcoran,* 855 F. Supp. 1359, 1367 (E.D.N.Y. 1994) (holding knife found on dresser table in plain view was properly seized); *United States v. Gotti,* 42 F. Supp. 2d 252, 275-76 (S.D.N.Y. 1999) (holding seizure of guns in plain view during search for business records and currency was proper under Fourth Amendment); *see also United States v. Wolfe,* 22 F. Supp. 2d 627, 643-44 (E.D. Mich. 1998) (rejecting argument that police could not seize firearms in plain view because officers allegedly knew defendant was a federally licensed firearms dealer and could not determine at the time of search if weapons were illegally possessed). As the Eighth Circuit has noted, "[p]robable cause demands not that an officer be 'sure' or 'certain' but only that the facts available to a reasonably cautious man would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime.'" *United States v. Garner,* 907 F.2d

60, 62 (8th Cir. 1990) (quoting *Texas v. Brown,* 460 U.S 730, 742 (1983)). Here, the Court finds that all three requirements of the plain view doctrine were met.

Moreover, the police officers were allowed to seize such weapons in plain view in the instant case because of their inherently dangerous nature, even before they established whether such weapons were illegally possessed. *See, e.g., United States v. Atchley,* 474 F.3d 840, 850 (6th Cir. 2007) ("[Defendant] argues that the seizure of the handgun was impermissible because there was nothing readily apparent that established its illegality. This argument fails, for even if a loaded handgun is legally possessed, because of its inherently dangerous nature, police may seize it if there are articulable facts demonstrating that it poses a danger."). In short, the Court concludes that the law enforcement officers were authorized to seize these weapons under the circumstances of this case and no Fourth Amendment violation occurred.[3]

In any event, even assuming *arguendo* that the officers exceeded the bounds of the warrant when they seized the weapons, defendant has failed to show that their search

resembled a general search. In other words, after carefully considering the defendant's undisputed version of the facts concerning the scope and duration of the search (as well as the computer search described *infra*), the Court concludes that the first prong of the two-part test for "flagrantly disregarding the terms of the warrant," as articulated by the Second Circuit in *Liu,* has not been met. Moreover, even if the first prong was met, there is no evidence of bad faith, as required under the second prong. Accordingly, there is no legal or factual basis for the drastic remedy of wholesale suppression in connection with the search in the instant case and the motion to suppress on such grounds is denied.

### B. The Computer Search

Defendant also argues that the forensic search of the computer seized from the home that uncovered an AOL search for "arson rico laws" must be suppressed because it was beyond the scope of the warrant. However, the Court disagrees and finds no basis to suppress the evidence of the AOL search seized from the computer.

### 1. The Facts

On January 18, 2008, the Court conducted a suppression hearing concerning the computer search. The government called one witness, William Moylan. Moylan testified at the suppression hearing regarding his forensic search of the Dell desktop computer seized from defendant's home on July 13, 2004 in Oceanside, New York. (Supp. Hr'g Tr., Jan. 18, 2008.) The defendant called no witnesses. After evaluating the credibility and demeanor of the witness, and the other evidence offered at the hearing, the Court makes the following findings of fact.

---

[3] However, as set forth on the record at the conference on January 23, 2008, the Court granted defendant's motion *in limine* under Rule 404(b) and Rule 403 to preclude introduction by the government of the weapons in its case-in-chief. There is no evidence that these weapons were used in any way in connection with the charged arson and, even if they had some marginal relevance to this case and could be introduced for a permissible purpose, any probative value would be substantially outweighed by the danger of unfair prejudice to the defendant and confusion of issues by the jury.

At the time of the search, Moylan was assigned to the Crimes Against Property Squad of the Nassau County Police Department. (*Id.* at 14.) Moylan personally removed the computer from the residence, brought it back to the police laboratory, and created a forensic image copy of the hard drive, which would be searched, while the original hard drive was preserved in evidence. (*Id.* at 16.) Based upon instructions given to him by other law enforcement officers regarding the scope of the warrant, Moylan understood that he was looking for data evidence related to gambling operations and activities. (*Id.* at 17-19.)

In terms of the procedure employed during the search of the computer, Moylan used a software package called Forensic Tool Kit ("FTK"), which searches through the entire file system and, based on file extensions, sorts the files by type, such as documents, spreadsheets, images, and executables. (*Id.* at 22.) Although Moylan searched the entire hard drive using FTK, he did not open every file. (*Id.* at 24, 44, 52.) Moylan explained that, in certain areas of the hard drive, there are operating system files which are often in binary format and, if the file structure appears to be a normal part of the operating system, he would not open it. (*Id.* at 24.) In terms of the files he did open, Moylan explained that he does not always base his decision on the name of a file. Specifically, Moylan stated:

> Files on a computer system are – file names are under the control of the user. So files can be renamed by the user to anything they want. And files are not always indicative of what the content of the file is.

(*Id.* at 25.) As a hypothetical illustration, Moylan explained that, if he had seen a file labeled "My Summer Vacation," he would open it to confirm that the content was not something that might be of evidentiary interest within the scope of the warrant. (*Id.* at 25-26.) When asked on cross-examination whether there was a way to restrict his search of the computer to gambling-related evidence, he responded, "There is no way I know of to be able to restrict the search in that way any more than you know ahead of time what's in a filing cabinet before you open it and look at the pages." (*Id.* at 45.)

In the instant case, when the files were sorted by FTK, Moylan recognized that there was a significant amount of evidence found in the internet history files. With respect to internet data, Moylan utilized another program called NetAnalysis which takes the various internet files and records and presents the examiner with a spreadsheet type of display that allows the examiner to sort the internet activity by date, by time, by web site location, or other factors that it shows. (*Id.* at 23.) Through this program, an examiner can determine the historical internet activity of the user of the computer, including the main page of the web site, as well as other locations within that web site that were accessed. (*Id.* at 28.) The web sites are almost always listed as an index, dot, an "HTM" or index, dot, and "HTML," and there are no descriptive terms associated with them. (*Id.* at 28, 34.) Therefore, in order to determine the content of the specific internet file, the examiner needs to open the file and see the display. (*Id.* at 30-31, 33.) By reviewing the metadata of the internet file, the examiner can also determine the date the site was accessed, as well as the last time it was accessed or modified. (*Id.* at 32.) If the examiner observed anything of evidentiary interest when opening these

internet files, he bookmarked the page so that he could retrieve it when his examination was done. (*Id.* at 31. ) Moylan explained to the Court why he searches each of these "HTM" or "HTML" files of internet activity:

> I will say in examining, especially internet history, searches that are conducted by the user are almost always worthy of further examination because it helps to give you what the user was thinking about, what he was using the computer for at this particular time. So they are almost always of interest. They are going to be looked at if they are present in the system.

(*Id.* at 34-35.) As a result, with respect to the computer seized in the instant case, Moylan clicked on the "HTM" and "HTML" file to determine whether the internet activity recorded in the file related to the subject matter of the search – namely, gambling-related records. (*Id.* at 33-34, 49.)

One such internet file on the spreadsheet created by the FTK was named "search[3].htm." and it was first created on July 3, 2004. (*Id.* at 32; Exh. GX 3.) In order to determine what was in that internet file and see the content of the web page contained in that file, Moylan needed to click on this file. (*Id.* at 33-34, 47.) The "htm" is simply a generic name for a web page that was used to make an internet search. (*Id.* at 44.) Once Moylan opened the file, he could immediately see that it contained an AOL Search conducted by the user of the computer using the terms "arson rico laws" at one time in the search box. (*Id.* at 36-37; Exh. GX 4.) Moylan identified this as an item of

evidentiary interest in connection with the search of gambling-related records because he understood RICO to be a federal statute that is used to prosecute illegal gambling offenses. (Supp. Hr'g Tr. 37-38.) In addition, Moylan knew at the time of the search that the Nassau County Police Department was conducting a parallel investigation of an arson that may have involved the same people who were under investigation for the gambling offenses (including Mr. Graziano) and, thus, the fact that the AOL search had the word "arson" in it made it "additionally significant." (*Id.* at 38, 43, 46.) However, Moylan emphasized that he bookmarked the term and put it in his report because it contained the word "RICO" which he saw as related to the gambling investigation. (*Id.* at 46.)

### 2. Overbreadth Challenge

As a threshold argument, to the extent that the defendant argues that the warrant is facially overbroad and invalid because it did not require a certain search methodology or limit the search of computers to certain keywords or terms, the Court finds that argument unpersuasive. There is nothing in the language of the Fourth Amendment, or in the jurisprudence of the Supreme Court or the Second Circuit, that requires such a rule in the context of a search of computers. *See Dalia v. United States,* 441 U.S. 238, 257 (1979) ("Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that . . . search warrants also must include a specification of the precise manner in which they are to be executed."). In fact, the Supreme Court has noted, as a general matter, that "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Id.* at 257. The

reason for not imposing such a requirement on law enforcement in conjunction with search warrant applications for computer searches is obvious – in most instances, there is no way for law enforcement or the courts to know in advance how a criminal may label or code his computer files and/or documents which contain evidence of criminal activities. In other words, to require courts in advance to restrict the computer search in every case to certain methodologies or terms would give criminals the ability to evade law enforcement scrutiny simply by utilizing coded terms in their files or documents, or placing such documents in areas of the computer that would not normally contain such files/documents. In today's technological age, a computer should not be a safe-haven for criminals to hide evidence of their criminal activities by unnecessarily limiting law enforcement's ability to search only certain files/documents on a computer with a certain name or term, or located in a certain area of the computer hard drive. Therefore, although the Second Circuit has not decided this precise issue, this Court declines to adopt a rule that would invalidate search warrants which did not contain a specific methodology explaining how the computers would be searched.

In reaching this decision, this Court joins numerous other courts in this Circuit and other circuits which have reached the same conclusion. *See, e.g., United States v. Hill,* 459 F.3d 966, 978 (9th Cir. 2006) ("[T]here is no case law holding that an officer *must* justify the lack of a search protocol in order to support issuance of the warrant."); *Brooks v. United States,* 427 F.3d 1246, 1251 (10th Cir. 2005) ("At the outset, we disagree with [defendant] that the government was required to describe its specific search methodology."); *United States v. Upham,* 168 F.3d 532, 537

(1st Cir. 1999) ("The . . . warrant did not prescribe methods of recovery or tests to be performed, but warrants rarely do so. The warrant process is primarily concerned with identifying *what* may be searched or seized – not how – and *whether* there is sufficient cause for the invasion of privacy thus entailed."); *United States v. Vilar,* No. S30CR621KMK, 2007 WL 1075041, at *37 (S.D.N.Y. Apr. 4, 2007) (rejecting argument that warrant must state with particularity how the computer will be searched) (collecting cases); *United States v. Lloyd,* No. 98 Crim. 529, 1998 WL 846822, at *3 (E.D.N.Y. Oct. 5, 1998) (same); *see also United States v. Sage,* No. 07-00006-01-CR-W-SOW, 2007 WL 4592074, at *11 (W.D. Mo. Dec. 27, 2007) ("[W]hile the issue has not been squarely addressed by the Eighth Circuit, courts in other circuits are essentially in agreement that a warrant 'need not specify how the computers will be searched'.") (quoting *Vilar*, 2007 WL 1075041, at *37)).

The Court emphasizes, however, that the rejection of the blanket rule suggested by defendant does not give law enforcement a license to turn every search of a computer into a general search; rather, there are Fourth Amendment limits to every search that apply with equal force to searches of computers. Thus, although courts are ill-suited to micromanage in advance how the computer will be searched, law enforcement must establish the basis for searching the computer and particularize the evidence being sought during such search. Specifically, in obtaining the warrant, the government must show that there is probable cause that the computer will contain evidence of a crime and then state with reasonable particularity the materials to be seized. In the instant case, those requirements were met in that law enforcement established probable cause to

believe that the defendant's home, including any computer, would contain evidence of gambling records and the search warrant particularized that it was limited to such gambling records, whether in paper or electronic form. Therefore, there is no basis for concluding that the search warrant was overbroad on its face or invalid under the Fourth Amendment because of the failure to include a particular methodology or search protocol in searching the computer.

### 3. Challenge to Manner of Search

Of course, in addition to satisfying these threshold Fourth Amendment requirements for the authorization of a computer search under the Fourth Amendment, the manner of the execution of the warrant in searching the computer also will be subject to judicial review under a "reasonableness" standard. *See, e.g., Hill,* 459 F.3d at 978 ("The reasonableness of the officer's acts both in executing the warrant and in performing a subsequent search of seized materials remains subject to judicial review."); *Sage*, 2007 WL 4592074, at *11 ("Viewing defendant's computer as the 'vessel' to be searched, once the officers were 'in' that vessel, the analysis of what was done thereafter is an analysis of the *method* or *manner* of the search, and not one of whether the search was justified . . . . Opening the individual files on defendant's computer was not an event subject to traditional probable cause analysis, but rather a method, subject simply to the requirement of 'reasonableness,' with great deference given to the expertise of the officers."). Here, defendant also challenges the manner of the computer search and contends that, even if the warrant was not required to specify a search protocol, the actual search of the computer went beyond the scope of the warrant because the government

engaged in a cursory review of almost every file, including opening AOL web search records, instead of using some type of method to only review gambling files or documents. As set forth below, after careful consideration of the defendant's submissions and conducting an evidentiary hearing on the manner of the search, the Court finds defendant's attempt to suppress the evidence obtained from the computer on such grounds to be unavailing.

As the Supreme Court has noted, "[i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Andreson v. Maryland,* 427 U.S. 463, 482 n.11 (1976); *see also United States v. Christine,* 687 F.2d 749, 760 (3d Cir. 1982) ("[N]o tenet of the Fourth Amendment prohibits a search merely because it cannot be performed with surgical precision."). Courts have applied this principle in analyzing the method used by the police in searching computers and have afforded them leeway in searching computers for incriminating evidence within the scope of materials specified in the warrant. *See, e.g., United States v. Fumo,* No. 06-319, 2007 WL 3232112, at *6 (E.D. Pa. Oct. 30, 2007) ("Regardless of the search protocols or keywords used by the government, the government may open and briefly examine each computer file to determine whether it is within the description recited in the warrant."); *United States v. Scarfo,* 180 F. Supp. 2d 572, 578 (D.N.J. 2001) ("Where proof of wrongdoing depends upon documents or computer passphrases whose precise nature cannot be known in advance, law enforcement officers must be afforded the leeway to wade through a potential morass of information in the target location to find the particular

evidence which is properly specified in the warrant.").

In the instant case, the police's forensic examiner conducted a search of the computer that was within the scope of the warrant and, rather than limit himself to searching files with certain names or terms, it was entirely reasonable for him to engage in a cursory review of files and documents, by opening them, to determine whether they contained evidence of illegal gambling that was within the scope of the warrant. Moreover, there was no evidence adduced at the hearing to suggest that the computer examiner, if he determined after opening a particular file that it did not contain any gambling-related materials, continued to analyze such materials further. With respect to the particular evidence that is the focus of the defendant's motion – namely, the uncovering of an AOL search by the user of the computer for "arson rico laws," the examiner credibly testified at the suppression hearing, with corroborating documentation, that he was searching the computer for internet searches that may have been related to illegal gambling and, in doing so, was required to open non-descriptive "html" files to determine what internet information was contained within that file. When he opened one such file, he saw that the computer user had searched the internet in July 2004 using the phrase "arson rico laws" and, because it had potential evidentiary interest, the forensic examiner bookmarked that record. The Court finds that the examiner's search of the computer and discovery of that evidence was executed in a manner that was within the scope of the warrant and was reasonable under the Fourth Amendment. *See generally Andreson*, 427 U.S. at 482 ("The complexity of an illegal scheme may not be used as a shield to avoid detection when the [government] has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession.").

In reaching this conclusion, the Court finds the specific arguments made by the defendant to be unpersuasive. For example, defendant argues that information regarding illegal gambling was not reasonably likely to be found in files containing AOL web search records because "professional gamblers do not use web searches to obtain sports related information" and, thus, the examiner should not have engaged in *any* search of AOL records stored on the computer. (Def.'s Reply Aff., dated Jan. 2, 2008, at 9) The Court finds this unsupported, conclusory assertion to be inconsistent with credible testimony of the examiner regarding his reasonable belief that evidence related to an illegal gambling operation might be contained in AOL web search records based upon his experience. Defendant's assertion also defies common sense. It is beyond cavil that an individual suspected to be involved in an illegal gambling operation might have utilized the internet in some manner to facilitate that operation and, thus, it was certainly reasonable for the examiner to engage in a cursory review of AOL web search records for such evidence.

Defendant's argument regarding "pretext" is similarly unavailing. Specifically, defendant argues that the computer examiner knew the defendant was also being investigated for arson at the time of the computer search and that the search for gambling records was simply a pretext for law enforcement's attempt to find evidence related to the arson. This precise argument was raised in *United States v. Pascarella,* 84 F.3d

61 (2d Cir. 1996) and rejected by the Second Circuit in the context of a search for gambling records. Specifically, in *Pascarella*, the defendant moved to suppress evidence seized from his home pursuant to a warrant "because the search was 'pretextual' in that, although the warrant dealt with evidence of gambling, the government's real motive was to discover evidence relating to the stolen check scheme." *Id.* at 72. The Second Circuit held that "[t]he district court correctly refused to suppress the evidence on the claim that the search was pretextual." *Id.* In reaching that holding, the Court explained:

> The warrant and search were valid on their face and within the authorization of the officers. Their validity cannot be impeached by the claim that in conducting the search for gambling evidence (some of which the police found), the police hoped to find evidence of another offense they also were investigating.

*Id.* Thus, defendant's pretext argument also fails under well-settled case law.[4]

_____

[4] In any event, as noted above, this argument is also not factually supported in this case as it relates to the evidence that is being challenged. In particular, the examiner did not discover the AOL evidence at issue by opening a file that was labeled "arson" or that had some other non-gambling name; rather, the file was a non-descriptive "html" file and it was only upon opening it that he saw the AOL search for "arson rico laws." Moreover, although such a search obviously contained potential evidence regarding arson in plain view, it also contained potential evidence regarding an illegal gambling operation in that

In sum, the Court finds no basis to suppress the evidence seized from the computer which the Government seeks to offer in this case. Specifically, the Court rejects defendant's challenge to the warrant as being constitutionally overbroad on its face, as well as his specific challenges to the manner in which the search was conducted in this case given the scope of the warrant. Accordingly, the motion to suppress the computer evidence is denied.

## C. Evidence of Prior Interactions/Acts Against Alleged Victims

The Government moved *in limine* to introduce evidence of the following prior bad acts of the defendant relating to a series of threats which the defendant made to the owners of Roseanne's and other interactions between the defendant and the owners, as well as the defendant's unsuccessful attempt to have the owners assaulted. The Court concludes that such evidence is admissible as background to the charged crime and under Rule 404(b), and has conducted the requisite balancing under Rule 403 regarding such evidence.

### 1. Background as to the Charged Crime

As the Second Circuit has repeatedly

_____

it made reference to RICO, which refers to federal racketeering laws that can be used to prosecute gambling. *See* 18 U.S.C. § 1961 (defining "racketeering activity" under RICO to include gambling). Thus, it is not surprising that the examiner considered this AOL search record to be of evidentiary interest in the gambling investigation once he opened it.

noted, "'evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" *United States v. Carboni,* 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez,* 110 F.3d 936, 942 (2d Cir. 1997)); *see also United States v. Inserra,* 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."); *United States v. Daly,* 842 F.2d 1380, 1388 (2d Cir. 1988) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.").

In the instant case, the Court concludes that the alleged prior interactions between the defendant and the Grahams, as well as the alleged attempted assault, are admissible under this well-established case authority. In particular, it is the government's position that the arson was the culmination of a series of escalating threats and actions by the defendant over a period of several years towards the owners of Roseanne's because of their complaints to law enforcement, as well as municipal and regulatory authorities, about the defendant's tavern. Given the charges and the government's theory of the case, this evidence regarding prior interactions with the alleged victims is critical to the jury understanding what may have led the defendant to hire someone to commit an arson of the victims' store, as the government alleges. In other words, if the jury were only allowed to consider the evidence of the arson in isolation, without reference to prior alleged escalating threats and actions towards the owners of Roseanne's, the jury may be unable to understand why an individual would resort to such a drastic and violent criminal act as arson to deal with his alleged dispute with the owners. *See generally United States v. Moore,* 735 F.2d 289, 292 (8th Cir. 1984) (finding that a jury "cannot be expected to make its decision in a void – without knowledge of the time, place, and circumstances of the acts which form the basis of the charge"). Although the defendant argues that the attempted assault is not particularly probative because it did not occur, the fact that the alleged assault was unsuccessful does not make it any less probative in terms of providing necessary context to the charged crime; rather, as noted above, it helps the jury understand why the defendant allegedly decided to resort to arson. *See, e.g., United States v. Serang,* 156 F.3d 910, 915 (9th Cir. 1998) (holding that, in arson case involving 1993 fire at restaurant, the admission of two prior attempts in 1992 and 1993 to set the restaurant on fire was proper because trial court found such incidents were "'inextricably intertwined' with the 1993 fire or alternatively, were admissible under Fed. R. Evid. 404(b) to prove appellant's intent"); *United States v. Lombardozzi,* S1 02 Cr. 273 (PKL), 2003 WL 1907969, at *1 (S.D.N.Y. Apr. 17, 2003) (holding that evidence of prior, uncharged extortionate loans allegedly made by defendant to victim was admissible as background evidence to loans charged in the indictment); *United States v. Chan,* No.

S1197CR1053 (PKL), 2002 WL 46994, at *3 (S.D.N.Y. Jan. 14, 2002) ("[T]he government intends to use this evidence to prove that the failure of his various schemes and the gambling debts, motivated the defendant to become involved in the alleged narcotics trafficking. Thus, the evidence provides a significant contextual basis for the jury to understand the defendant's actions . . . .") (citation omitted); *United States v. Frank,* 11 F. Supp. 2d 314, 317 (S.D.N.Y. 1998) (holding evidence of narcotics dealing necessary, among other things, to complete the story of the crimes charged, including kidnapping).

In short, the evidence regarding the series of interactions between 1999 and 2003, including the alleged threatening conduct in direct conversations with the victims as well as the alleged unsuccessful plan to assault the victims, is inextricably intertwined with the charged arson and is clearly necessary to complete the story of the crime on trial. Accordingly, because the Court also finds that the evidence is not precluded under Rule 403 analysis for the reasons discussed *infra,* the Court finds such evidence admissible for these purposes.

### 2. Rule 404(b)

Rule 404(b) of the Federal Rules of Evidence provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). However, the Rule then provides that "[i]t may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan knowledge, identity, or absence of mistake or accident." *Id.* "The Second Circuit's 'inclusionary approach' to the admission of other act evidence 'allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity.'" *United States v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007) (quoting *United States v. LaFlam,* 369 F.3d 153, 156 (2d Cir. 2004) (per curiam)). Under this standard, the Second Circuit has repeatedly held that such evidence is admissible to demonstrate, among other things, the motive and/or intent of the defendant in committing the charged crime. *See, e.g., LaFlam,* 369 F.3d at 156 (admitting evidence of drug use to demonstrate motive for robbery); *United States v. Rodriguez*, 53 F.3d 545, 546 (2d Cir. 1995) (admitting evidence of links to drug organization to establish motive for visiting building controlled by organization); *United States v. Blum,* 62 F.3d 63, 68 (2d Cir. 1995) (admitting evidence of embezzlement to show motive to fabricate company records); *United States v. Gonzalez,* 922 F.2d 1044, 1056 (2d Cir. 1991) (admitting evidence of cash recovered from defendant to demonstrate he was a drug dealer with motive to murder cooperating witness); *United States v. Willoughby,* 860 F.2d 15, 24 (2d Cir. 1988) (admitting evidence of participation in uncharged robbery as relevant to show motive in conspiracy to obstruct justice); *United States v. Pedroza,* 750 F.2d 187, 201 (2d Cir. 1984) ("[S]ome detail as to the events involving the cocaine was necessary to the jury's understanding of, for example, whether a kidnaping was intended, why a kidnaping might have been thought desirable, and why the person abducted was [the victim].").

Of course, the admission of such evidence for these other purposes is still subject to the balancing of Fed. R. Evid. 403. *See United States v. Brennan,* 798 F.2d 581, 589 (2d Cir. 1986) (finding prior acts evidence admissible for purposes other than

showing criminal propensity "as long as it is 'relevant to some disputed issue in the trial' and satisfies the probative-prejudice balancing test of Fed. R. Evid. 403") (quoting *United States v. Figueroa*, 618 F.2d 934, 939 (2d Cir. 1980)). Thus, in considering the admissibility of such evidence, the Court should consider whether (1) the evidence is being offered for a proper purpose, (2) the evidence is relevant to a material issue in dispute, and (3) the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under Rule 403. *See Guang*, 511 F.3d at 121, at \*9; *accord Huddleston v. United States*, 485 U.S. 681, 691-92 (1988). Moreover, the Court should give the jury an appropriate limiting instruction concerning the proper use of that evidence, if such a request is made by the defendant. *See Guang*, 511 F.3d at 121; *Huddleston,* 485 U.S. at 691-92; Fed. R. Evid. 105.

In the instant case, the Court concludes that the evidence of prior acts relating to the Grahams is admissible under Rule 404(b). First, the government seeks to admit such evidence for a proper purpose – namely, motive and/or intent. As discussed in detail *supra*, a key aspect of the government's proof relates to its need to explain to the jury what motivation the defendant would have had to allegedly hire someone to set a fire at Roseanne's in August 2003. This proof regarding the alleged acrimonious relationship over a several year period between the defendant and the owners of Roseanne's, and the alleged unsuccessful prior attempts to intimidate the owners into ceasing their complaints about Copperfield's to law enforcement and other authorities, is extremely probative on the issue of motive. Second, the issues of motive and intent are vigorously disputed by the defendant. In both written submissions and oral arguments to the

Court, both in connection with the detention hearing and the instant motion, counsel for defendant made clear that they were going to argue that the alleged victims are not credible and have exaggerated the scope and intensity of any dispute they had with the defendant. Moreover, in pre-trial submissions, counsel for defendant also made clear that defendant's position is that defendant only directed the cooperating witness, Frank Morrow, to engage in property damage at Roseanne's by breaking a window, and that defendant never requested nor intended that Morrow would commit an arson. Therefore, it is clear that motive, including the nature of defendant's interactions with the owners of Roseanne's in the months and years preceding the arson, and intent are critical issues in the case.

Courts in analogous circumstances have similarly concluded that evidence of prior bad acts are admissible to establish a motive or intent for an arson or other violent crime. For example, in *United States v. Buchanan,* 787 F.2d 477, 479 (10th Cir. 1986), the defendant was accused of hiring two individuals to burn a trailer home using a firebomb, which consisted of a plastic milk container filled with gasoline and charcoal fluid. On appeal, defendant argued that the district court had improperly admitted evidence regarding hostility that the defendant had shown towards the owner of the trailer prior to the arson including (1) an incident about one year prior to the arson in which the trailer owner intervened when defendant began to spank his step-daughter in the trailer, and (2) an incident three months prior to the arson in which the trailer owner told the defendant to leave a hospital room the and defendant held up a roll of money and said, "I've got you right here." *Id.* at 480. The trial court also allowed testimony that the defendant told a friend of the trailer owner

about two months prior to the incident that "I love you and I'm going to get to you through someone you love." *Id.* The Tenth Circuit held that the district court properly admitted the evidence under Rule 404(b) because "[t]he threats against [the trailer owner] had substantial probative value" because they were relevant to the reason why defendant solicited a person to firebomb the trailer. *Id.* at 481; *see also United States v. Higgs,* 353 F.3d 281, 312 (4th Cir. 2003) (admitting evidence of unrelated bank fraud scheme to show possible motive for murder); *United States v. Edwards,* 159 F.3d 1117, 1129 (8th Cir. 1998) (admitting evidence of prior drug use and thievery in arson case to establish motive); *United States v. Morrison,* 153 F.3d 34, 57 (2d Cir. 1998) (admitting, in prosecution regarding the transmissions of threats, tape-recorded conversations between defendant and hospital director where former girlfriend worked under Rule 404(b) to show, among other things, defendant's knowledge, intent, and plan to threaten, harass, and terrify former girlfriend); *United States v. Hinton,* 31 F.3d 817 (9th Cir. 1994) (admitting evidence of four previous assaults of victim under Rule 404(b) because "the charged and prior conduct were part of a pattern of abuse involving the same victim and . . . similar *modus operandi*").[5]

Although defendant argues that the alleged threats that occurred in 1999 and 2000, as well as the alleged unsuccessful assault in Fall 2001 are too remote to be probative in connection with the alleged arson that took place in August 2003, the Court disagrees. It is clear from the Government's detailed proffer regarding the evidence of the interactions between defendant and the Grahams that the Government's theory of the case is that "[t]he parties were at battle, and the arson was the final volley." (Government's Jan. 13th Letter, at 6.) Specifically, even though these alleged acts occurred several years prior to the arson, the Government intends to show that the defendant continued to have problems in 2002 and 2003 because of the Grahams' complaints, including the following: (1) in 2000, the Village of New Hyde Park (the "Village") fined Copperfield's for violations of the local code; (2) in 2002, hearings were held by the New York State Liquor Authority and Copperfield's was fined as a result of those hearings; (3) in 2002, the Village denied Copperfield's application for a renewal of its

---

[5]    There are also a number of unpublished decisions that have affirmed the district court's admission of the type of evidence on the issue of motive or intent. *See, e.g., United States v. Robles,* No. 05-10427, 2006 WL 984916, at *1 (9th Cir. Apr. 7, 2006) (unpublished opinion) (affirming admission under Rule 404(b) of evidence that the man whom defendant is alleged to have assaulted had, approximately eight years earlier, reported defendant to police for theft of vehicle); *United States v. Yazzie,* No. 00-10517, D.C. No. CR-00-00096-EHC, 2002 WL 465160, at *3 (9th Cir. Mar. 12, 2002) (unpublished

opinion) (holding prior abusive conduct admissible in murder case because it was "part of a pattern of escalating abuse involving the same victim and a similar type of harm"); *United States v. Smith,* No. 97-6398, 1999 WL 970300, at *5 (6th Cir. Oct. 15, 1999) (unpublished opinion) (holding that, in arson case, alleged criminal mischief directed at victim several weeks before arson was properly admitted under Rule 404(b) to demonstrate motive for arson); *United States v. Clay,* No. 98-1783, 1998 WL 847098, at *4 (7th Cir. Nov. 13, 1998) (unpublished opinion) (holding that, in arson case, prior arm-twisting incident between defendant and victim of fire was properly admitted under Rule 404(b) where "trial judge determined that the evidence was relevant to [defendant's] motive to commit arson").

cabaret license; and (4) in June 2003, community organizers held a protest meeting, which led to increased police patrols around Copperfield's. (*Id.* at 2.) Therefore, there is sufficient evidence for the Government to be able to argue to the jury that these earlier events were not unrelated to the arson, but rather "[t]he threats and the assault were part of a continuous pattern of acrimony between the parties from 1999 through 2003" (*id.* at 6-7), that culminated in the arson. Thus, the evidence of defendant's statements and actions towards the Grahams from 1999 through the time of the arson are highly probative on the issue of motive and intent. *See, e.g., Hinton,* 31 F.3d at 823 (finding even though the most recent abusive act occurred about two years prior to the charged incident, "the earlier episodes in this pattern of abuse, linked to the charged assault by a chain of similar conduct, do not face the same temporal limitations as a similarly remote discrete act would encounter under Rule 404(b) analysis"); *United States v. Franklin,* 704 F.2d 1183, 1189 (10th Cir. 1983) (finding misconduct occurring over three years earlier not too remote).

Finally, with respect to the requisite Rule 403 balancing, the Court views this evidence, for the reasons discussed above, as highly probative both in terms of providing necessary background to the crime charged and, under Rule 404(b), on the issues of motive and intent. In a prosecution where the defendant is charged with the commission of a violent act in which he allegedly hired someone to set a fire at a store, the danger of unfair prejudice from the admission of this evidence for this legitimate purpose is minimal. *See, e.g., United States v. Livoti,* 196 F.3d 322, 326 (2d Cir. 1999) (finding no abuse of discretion in admitting evidence of uncharged act where it "did not involve

conduct more inflammatory than the charged crime"). In any event, any potential for unfair prejudice can be addressed by a limiting instruction to the jury that explains the purpose for which this evidence is being offered.[6] Thus, the Court has performed the Rule 403 balancing and, after careful consideration of the evidence under the circumstances of this case, finds that the danger of unfair prejudice does not substantially outweigh the high probative value.

Accordingly, the government's motion *in limine* to introduce evidence regarding (1) the series of prior threats which defendant allegedly made to the owners of Roseanne's, and (2) the defendant's unsuccessful attempt to have the owners assaulted, is granted.

### D. Evidence Regarding Gambling Activity at Copperfield's

The Government also moved *in limine* to introduce evidence regarding illegal gambling at Copperfield's. Specifically, the Government sought to introduce the following: (1) an undercover investigator hired by the Grahams observed a Joker Poker machine in plain view in Copperfield's on June 22, 2002; and (2) undercover officers placed bets with the bartender at Copperfield's beginning on August 22, 2003 (eleven days after the fire) and continuing into 2004. In terms of the probative value of the evidence, the Government argues that "evidence of illegal gambling in Copperfield's during the period immediately after the fire at Roseanne's, and, potentially, during the period immediately preceding it, provides a

---

[6] Such a limiting instruction was given twice during the trial and also during the instructions to the jury at the conclusion of the case.

powerful motive for the defendant to have resented the increased police patrols generated by complaints from Roseanne's owners." (Government's Jan. 15th Letter, at 2.) The defendant asserts in opposition that "there is no evidence of illegal gambling at Copperfields during the relevant time period, and that in any event the bookmaking activities did not occur at times and places where they might have been viewed by police officers responding to noise complaints." (Defendant's Jan. 17th Letter, at 6.) As set forth below, although the Government is seeking to offer this evidence for a proper purpose on the issue of motive, the Court does not believe that the proffered evidence is sufficiently probative to survive the Rule 403 balancing.

The Court recognizes that evidence of a substantial gambling operation at Copperfield's being directed by the defendant in the weeks or months prior to the arson could constitute probative evidence of motive. However, the probative value of the particular gambling evidence proffered by the government to provide motive is significantly diminished because of its failure to directly implicate the defendant, as well as because some of the evidence of gambling is relatively minor and occurred years before the fire. For example, evidence there was a Joker Poker machine in the bar in 2002 hardly provides the type of evidence from which a jury could infer that the defendant committed the arson in 2003 to protect a large gambling operation at Copperfield's, which was being subjected to increase police scrutiny because of the Grahams' complaints about noise and related issues. Similarly, the fact that an undercover placed bets with a bartender at Copperfield's shortly after the fire also does not provide significant evidence that the defendant himself was, in the period prior to the arson,

supervising a large gambling operation at the bar. Moreover, it is important to note that the Grahams never complained about illegal gambling at Copperfield's to the defendant or anyone else and, thus, the gambling evidence is not necessary to corroborate, or provide context, to the Grahams' testimony regarding the nature of their interactions with defendant. Moreover, as discussed in detail *supra*, the government is already being permitted to introduce evidence of a substantial motive for the arson through the testimony of the interactions between the Grahams and the defendant.

In addition, the Court has considered the potential unfair prejudice and collateral issues that may result from allowing this particular evidence to be admitted in this form. Specifically, the Court is concerned that the introduction of this gambling evidence would lead to a "mini-trial" concerning the nature and scope of any gambling activity at Copperfield's and the defendant's knowledge and/or involvement with respect to any such activities. Therefore, pursuant to Rule 403, the Court concludes that any probative value of such evidence regarding gambling at the bar is substantially outweighed by the danger of unfair prejudice and confusion of issues.

Accordingly, the government's motion to admit evidence of gambling is denied.[7]

---

[7] On the eve of trial, the government renewed its application to admit evidence of illegal gambling and also sought to introduce evidence of drug trafficking at Copperfield's. Specifically, the government proffered additional evidence regarding such activities that it had not presented to the Court at the time of the initial motion. The Court denied the government's renewed application for the reasons stated on the record and

### E. Evidence of Defendant's Offer to Take Polygraph

The Government also moved *in limine* to preclude defendant from eliciting evidence that, during an "innocence proffer" with government representatives and his attorney present, the defendant offered to take a polygraph examination. Defendant argues that the jury should be able to consider his offer to take a polygraph as consciousness of innocence. The Court finds this evidence to be inadmissible under Rules 401 and 403.

Although the Second Circuit has never addressed this precise issue, other circuit courts have concluded that "[i]n limited circumstances, evidence of a party's willingness to submit to a polygraph may, within the discretion of the trial court, become admissible if it is relevant at trial." *United States v. Harris,* 9 F.3d 493, 501-02 (6th Cir. 1993) (citing *Wolfel v. Holbrook,* 823 F.2d 970, 972 (6th Cir. 1987)). In exercising its discretion, the Court must first determine whether the evidence is relevant and, if so, the Court must then evaluate its probative value against the danger of unfair prejudice or jury confusion under Rule 403. *See Harris,* 9 F.3d at 502. Numerous courts, in conducting this Rule 403 balancing, have found evidence of an offer to submit to a polygraph to be inadmissible. For example, in *Harris,* the Court concluded:

> We agree with the government that [the defendant's] willingness to submit to polygraph testing, in the presence of an attorney, was marginally relevant at best on the issue of credibility. [The defendant] did not agree to allow the results of any such examination, whatever they might reflect, to be admitted into evidence at a subsequent trial. Hence, he did not have the requisite "adverse interest at stake to cloak his willingness with credibility."

*Harris,* 9 F.3d at 502 (quoting *Wolfel,* 823 F.2d at 974); *see also United States v. Bursten,* 560 F.2d 779, (7th Cir. 1977) ("We find no error in the trial court's refusal to permit defendants to state that they would have been willing to submit to a pretrial polygraph examination. Such evidence is so unreliable and self-serving as to be devoid of probative value.").

In the instant case, this Court similarly finds the defendant's offer to take a polygraph to be inadmissible under Rules 401 and 403. The offer was made in the context of a proffer session with the government in the presence of an attorney and there was no agreement with the government that the results of any such examination would be admissible. In the absence of such an agreement, the offer tells the jury nothing about the defendant's state of mind because the offer has no adverse consequences in that, if the government agrees to allow the defendant to take the exam and he passes, such results will still generally be inadmissible under the current state of the law. Given the lack of adverse consequences from such an offer, there is no way to distinguish between the offer being made by an innocent defendant and the offer being made by a guilty defendant for purely

---

found that the new evidence did not alter the Court's previous above-referenced analysis in connection with its denial of the government's initial motion seeking to introduce gambling evidence.

strategic reasons. In other words, a guilty defendant could make such offer knowing: (1) the government is unlikely to accept his offer and, if they decline, he can attempt to introduce evidence of his offer as consciousness of innocence, or (2) if the government agrees to his offer and he fails the polygraph test, the results are still inadmissible. Therefore, the Court finds that this offer, under the circumstances of the case, has no probative value in the assessment of the defendant's state of mind or his credibility. Moreover, even if it had some relevance as to those issues, the Court finds that any probative value is substantially outweighed by the danger of unfair prejudice to the government under Rule 403 because of the jury's inability to assess the weight to be given such testimony due to the layperson's lack of understanding about the numerous legal and practical variables that surround such an offer to take a polygraph, including the reasons why the government might not elect to conduct such a polygraph, problems with the reliability of such tests, and the general inadmissibility of the results of such tests in federal court. Finally, any attempt to inform the jury as to these other factors would undoubtedly lead to juror confusion that would substantially outweigh the probative value.

Accordingly, in the exercise of its discretion, the Court concludes that the evidence of the offer to take a polygraph should be excluded and grants the government's motion *in limine* to preclude such evidence.

F. Evidence Regarding 924(c) Penalties

The Government also moved *in limine* to preclude any mention by the counsel of the defendant of the penalties for the use of the destructive device during the commission of a crime of violence pursuant to 18 U.S.C. § 924(c), which is the charge against the defendant in Count Three of the Indictment. Specifically, that count carries a mandatory minimum term of imprisonment of 30 years to run consecutively to any term of imprisonment imposed for the underlying crime of violence. *See* 18 U.S.C. § 924(c)(1)(b)(ii). Defendant argues that he should be able to mention such penalty during the cross-examination of two of the government's cooperating witnesses, William Norman and Frank Morrow, because these witnesses could have faced a 924(c) charge, but the government did not require them to plead guilty to such a charge as part of their respective cooperation agreements; rather, the witnesses were permitted to plead guilty to an arson charge carrying a penalty of 7 to 40 years' imprisonment and the government agreed that no further charges would be brought against them in connection with the arson. As set forth below, the Court concludes that reference to the exact penalty for a Section 924(c) offense is unnecessary for the defense to effectively cross-examine these government witnesses and, given that such reference would advise the jury as to the punishment the defendant is facing if they convict him on Count Three, the Court concludes that any such reference should be precluded under Rule 403.

The Court recognizes that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska,* 415 U.S. 308, 316 (1974). However, it is well-settled that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things,

harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986); *accord United States v. Maldonado-Rivera,* 922 F.2d 934, 956 (2d Cir. 1990); *see also United States v. Luciano-Mosquera,* 63 F.3d 1142, 1153 (1st Cir. 1995) ("A district court is entitled to cut off cross-examination that may create prejudice or confusion of the issues, or may be harassing or unduly repetitive"). Thus, "[c]ross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Roldan-Zapata,* 916 F.2d 795, 804 (2d Cir. 1990) (citing *United States v. Singh,* 628 F.2d 758, 763 (2d Cir. 1980)). For example, in *United States v. Rosa,* 11 F.3d 315 (2d Cir. 1993), the Second Circuit found that the trial court was well within its discretion in barring questioning of cooperating witnesses regarding the effect of the Sentencing Guidelines on their sentences:

> The court permitted cross-examination of those witnesses as to their plea agreements, the statutory maximum sentences they faced, and the benefits they hoped to gain from cooperation. The court was well within its discretion in ruling that the vagaries of Guidelines calculations were not a proper subject for cross-examination.

*Rosa*, 11 F.3d at 336.

In the instant case, if the Court permitted defense counsel to cross-examine the cooperating witnesses regarding the penalties for the Section 924(c) charge, the jury would then have been acutely aware that the defendant was facing a mandatory minimum of 30-years on Count Three of the Indictment. The presentation of such information to the jury creates a substantial danger that the jury will consciously or subconsciously allow knowledge of such punishment to impact on their deliberations on the question of the defendant's guilt or innocence. Although the Court recognizes that the Confrontation Clause requires that the defendant be able to cross-examine these witnesses regarding their biases or motives to lie, there is more than sufficient information available to defense counsel in the instant case to allow them to effectively cross-examine these witnesses on those issues without specifically mentioning the absence of a Section 924(c) charge against them and the penalties that would otherwise go with such charges. Specifically, defense counsel can question these witnesses regarding, among other things, the fact that (1) absent an agreement with the government, they were facing a maximum penalty of 40 years' imprisonment for the involvement in the arson offense; and (2) they entered into a cooperation agreement with the government and pled guilty to that charge and are hoping for leniency based upon their cooperation in connection with the 7-40 year sentence that are currently facing. Moreover, without making specific reference to Section 924(c) or its penalties, defense counsel can also bring out on cross-examination that there were other charges to which the government did not require them to plead guilty that could have increased their statutory exposure even further. Thus, the jury will know that these witnesses were facing potential penalties in excess of 40 years' imprisonment on the arson if they did not cooperate and that are hoping

for leniency in connection with that potential punishment by entering into an agreement with the government and testifying against the defendant. Such questioning allows the jury to make a "discriminating appraisal" of their credibility and their potential biases and motives to lie. Any incremental probative value of advising the jury that they could have also faced an additional count that could have brought their exposure up from 40 years to 70 years' imprisonment is substantially outweighed by the danger of unfair prejudice if the jury hears about the potential punishment that the defendant is facing.[8]

The Seventh Circuit, in *United States v. Luciano-Mosquera, supra,* was confronted with precisely this issue and reached the same conclusion. In particular, in *Luciano-Mosquera*, the appellant argued that the district court erred in curtailing his cross-

examination of the government's cooperating witness by not allowing him to question the witness about the additional penalty of 35-years in jail that the witness would have faced on a Section 924(c) charge if the government had not agreed to drop the firearms charges against him as part of his cooperation. *Luciano-Mosquera,* 63 F.3d at 1153. The district court precluded the specific question about the penalties because the defendants faced the same firearms charges and the court viewed the question as an impermissible attempt to inform the jury of the potential punishment that the defendants were facing. *Id.* In affirming the trial court's decision, the Seventh Circuit explained:

> [The defendant] claims that this truncating of his cross-examination impermissibly interfered with his right to confrontation under the Sixth Amendment. We disagree. [The defendant] had a sufficient opportunity to expose potential biases, including any bias resulting from any benefit [the cooperating witness] received as a result of his cooperation. [The defendant] was able to ask [the witness] repeatedly whether he had received a benefit for his testimony. Any probative value of information about the precise number of years [the witness] would have faced had he been charged for the firearms offense was slight. The district court properly decided that the value of the information was outweighed by the potential for prejudice by having the

---

[8] The Court is also concerned about the potential confusion that reference to mandatory minimums could have given the fact that these witnesses would not have been subject to mandatory minimums if the government moved under Section 3553(e) as a result of their cooperation. In other words, reference to the government only requiring a guilty plea to the 40-year count and foregoing a count that had a mandatory minimum of 30 years could create the impression that the failure to include that count in the cooperation agreement was a huge benefit because it eliminated a mandatory minimum, even though the witness could be relieved from any mandatory minimum under Section 3553(e) by a government motion even if he had been required to plead to a Section 924(c) charge as part of his cooperation agreement. Thus, the complexities of mandatory minimums in the context of cooperation and the potential confusion resulting from such questioning provides an additional reason, given the other issues described above, to curtail questioning regarding the particular penalties of the absent Section 924(c) charge.

jury learn what penalties the defendants were facing.

*Id.*; *see United States v. Nelson,* 39 F.3d 705, 707-09 (7th Cir. 1994) (upholding restriction during cross-examination on penalty witness would face if the government had not dropped charges); *Brown v. Powell,* 975 F.2d 1 (1st Cir. 1992) (same); *see also United States v. Arocho,* 305 F.3d 627, 636 (7th Cir. 2002), *superseded by statute on other grounds as recognized in United States v. Rodriguez-Cardenas*, 362 F.3d 958, 959-60 (7th Cir. 2004) (affirming exclusion of cross-examination of government witnesses regarding specific sentences and sentencing guideline ranges they faced before and after cooperation with the government, where the jury had learned that in exchange for their testimony, the government had dismissed several charges against them and instructed the jury to consider their testimony with great caution); *United States v. Cropp*, 127 F.3d 354, 359 (4th Cir. 1997) (affirming exclusion of cross-examination regarding the potential sentences faced by cooperating witnesses); *United States v. Mulinelli-Navas*, 111 F.3d 983, 988 (1st Cir. 1997) (same). Here, as in *Luciano-Mosquera*, the defendant's rights under the Confrontation Clause will not be hindered because he will have sufficient opportunity to cross-examine the witnesses regarding the extremely high penalties that the cooperating witnesses face and any potential bias resulting from the benefits of cooperation, without having to resort to questioning regarding the particular penalties for the potential 924(c) charge which would undermine the Court's ability to prevent the jury from knowing the potential punishment that the defendant is facing.

Accordingly, the government's motion *in limine* is granted regarding any specific reference to Section 924(c) or its penalties. However, as noted above, the Court will allow defense counsel to question these two witnesses generally on the fact that, in addition to current 40-year exposure, the government agreed not to bring additional charges regarding the arson that could have substantially increased their statutory exposure even further. Such questioning strikes the proper balance in the instant case of ensuring effective cross-examination under the Confrontation Clause without unnecessarily exposing the jury to the defendant's potential punishment.[9]

CONCLUSION

For the reasons set forth above and orally on the record in Court, (1) the defendant's motion to suppress is denied; (2) the government's motion *in limine* to admit certain evidence is (a) granted as to the evidence regarding the prior interactions between defendant and the owners of Roseanne's (including the alleged threats), as well as the alleged unsuccessful attempt to have the owners of Roseanne's assaulted; and (b) denied as to the illegal gambling evidence; and (3) the government's motion *in limine* to preclude evidence regarding defendant's offer to take a polygraph and any reference by defense counsel during the trial regarding the penalties for Count Three is granted.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

---

[9] In fact, such questioning of the cooperating witnesses did take place during the trial consistent with the Court's pre-trial ruling.

Dated: March 20, 2008
Central Islip, New York

* * *

The attorney for the Government is Evan Williams, Esq., of the United States Attorneys Office for the Eastern District of New York, 560 Federal Plaza, Central Islip, NY 11722. The attorneys for the defendant are Benedict S. Gullo, Jr., Esq., 114 Old Country Road, Suite 212, Mineola, NY 11501 and Joel R. Weiss, Esq., of Farrell Fritz, P.C., 1320 Reckson Plaza, Uniondale, NY 11556-1320.