# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

N° 07-CR-0508 (JFB) (MLO)

————————————

UNITED STATES OF AMERICA

VERSUS

CARMINE GRAZIANO,

Defendant.

————————————

MEMORANDUM AND ORDER
September 10, 2008

————————————

JOSEPH F. BIANCO, District Judge:

On March 5, 2008, following a jury trial, defendant Carmine Graziano (hereinafter, "defendant" or "Graziano") was convicted of all counts contained in the three-count Superseding Indictment, 07-CR-508 (S-1) (JFB). Specifically, Graziano was convicted of the following: (a) one count of conspiracy to commit arson, in violation of Title 18, United States Code, Section 844(n) ("Count One"); (b) one count of arson, in violation of Title 18, United States Code, Section 844(i) ("Count Two"); and (c) one count of using a destructive device during a crime of violence, in violation of Title 18, United States Code, Section 924(c) ("Count Three"). The Indictment related to an arson of Roseanne's Cards Galore ("Roseanne's") in New Hyde Park, New York on August 11, 2003. The government submitted evidence at trial that Graziano approved of, and paid for, the August 11, 2003 fire at Roseanne's because of a several-year dispute between the owners of

Roseanne's and Graziano, who owned a tavern named "Copperfields" located next door to Roseanne's. The government's theory of the case was that the arson was in retaliation for complaints by the owners of Roseanne's, Joseph and Anna Graham (collectively, the "Grahams") to local law enforcement, as well as municipal and state regulatory authorities, regarding, among other things, late night noise, violence, and underage drinking at Copperfields.

Graziano now moves, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, for judgment of acquittal on Count Three, which carries a mandatory 30-year consecutive sentence. Graziano moves on two separate grounds: (1) that the device that was described in Count Three and was the basis for conviction on that count – namely, "a plastic can containing flammable liquid with a cloth rag protruding as a fuse" – cannot, as a matter of law, constitute a "destructive device" under the applicable statute; and (2) that there was

insufficient evidence for a rational jury to conclude that it was "reasonably foreseeable" to Graziano, under *United States v. Pinkerton*, 328 U.S. 64 (1946), that his co-conspirators would use a destructive device to commit the arson. The government opposes the motion.

For the reasons set forth below, after careful consideration of the parties' written submissions and the oral argument, the Court concludes that, although the device utilized in the instant case qualifies as a "destructive device" under the statute, there was insufficient evidence to support the defendant's conviction on Count Three under *Pinkerton*. In particular, the government's evidence at trial was that (1) the defendant was not present when the fire was set by the co-conspirators; and (2) there was no discussion whatsoever between the defendant and the co-conspirators regarding any method the co-conspirators would use to set the fire. In addition, there was no discussion about what level of damage should occur or any difficult issues that would be posed by the task at this particular store. In fact, the only evidence offered at trial regarding conversations with the defendant about the fire was an extremely brief discussion in which the co-conspirator told the defendant he was going to set a "small fire" to the store, which the defendant approved, without any further explanation regarding how he would set that fire. Viewing this evidence in the light most favorable to the government, there was insufficient basis for a rational jury to conclude that it was "reasonable foreseeable" to the defendant from such conversation or the surrounding circumstances that a destructive device would be utilized, especially where Roseanne's was adjacent to the defendant's bar. In other words, there is no reason for a defendant in such circumstances to reasonably believe that an incendiary bomb would be

used to set a "small fire." In essence, in order for the Court to sustain a conviction on this count, the Court would have to find that it is rational to conclude that, any time that a defendant hires someone to set a "small fire" at a commercial store, it is reasonably foreseeable that the person hired to commit the task will use a destructive device, such as the incendiary bomb used in the instant case, because of the nature of the request and the task at hand. The Court is unwilling to find that such a conclusion can be reached by a reasonable jury, absent some other facts or evidence regarding defendant's knowledge – which do not exist in the instant case. In short, no rational jury could find in this case that utilizing an incendiary bomb was a necessary or natural consequence of a conspiracy to set a small fire at a card store. Accordingly, although a Rule 29 dismissal is an extraordinary remedy, such a dismissal on Count Three is warranted under the peculiar facts of this case.

## I. BACKGROUND

### A. The Trial Evidence

On February 25, 2008, the trial commenced. The government called fifteen witnesses, including the following: (1) Investigator Joseph Whittaker ("Whittaker") of the Nassau County Office of the Fire Marshal's Bureau of Fire Investigation who, without objection, was permitted by the Court to testify as an expert in determining the origin and cause of fires; (2) Explosives Enforcement Officer Alex Guerrero ("Guerrero") of the Bureau of Alcohol, Tobacco, Firearms and Explosives who, without objection, was allowed by the Court to testify as an expert in the classification of explosives and explosive devices; (3) the Grahams; (4) William Norman ("Norman"), who testified about his

participation in the arson with co-conspirator Frank Morrow ("Morrow"); and (5) Morrow, who testified about the defendant's hiring of him to commit the arson of Roseanne's and the execution of the arson with co-conspirator Norman. The government also offered numerous physical exhibits into evidence, including a videotape, taken from a surveillance camera at Roseanne's, of Morrow and Norman committing the arson on August 11, 2003, by Morrow throwing a rock through the front window of Roseanne's and Norman lighting a device – consisting of a cloth rag protruding from a plastic gas can containing gasoline – and throwing it through the window as the device burst into flames. A brief summary of the trial evidence is set forth below.

In 1999, Graziano opened a bar called J.P. McCauley's in New Hyde Park, New York. He later changed the name to Copperfields. Roseanne's, which was a stationery store owned and operated by the Grahams, was located next door to Copperfields. Over the next several years, an acrimonious relationship developed between Graziano and the Grahams. In particular, the Grahams had complaints about various aspects of Graziano's operation of Copperfields, including the following: (1) noise from the bar late at night, about which the Grahams received complaints from their tenant who lived in an apartment above Roseanne's; and (2) physical damage to the store, which the Grahams believed was caused either by a Copperfields patron, or by Graziano himself.[1]

(Tr. 140-49.) As a result of these incidents, the Grahams installed surveillance cameras and a video recorder at Roseanne's, which were later upgraded. (Tr. 149-52; Government Exhibit ("GX") 50A, 50B.) The surveillance cameras were mounted at each upper corner of the store's front window, and included views of the sidewalk and street in front of Roseanne's. (Tr. 180; GX 1.) In addition, the Grahams took a number of other actions to address the problems with Copperfields, including the following: (1) filing a civil suit against Graziano in the Fall of 2000; (2) complaining to the New York State Liquor Authority about underaged drinking and violations with respect to Graziano's delivery of liquor to the bar; (3) filing complaints with the Nassau County Police Department; (4) organizing community meetings, including a June 2003 meeting attended by police representatives; (5) appearing at a hearing in February 2002 in the Town of New Hyde Park to oppose renewal of Copperfields's cabaret license; and (6) organizing a petition to mobilize against these activities at Copperfields. (Tr. 153-58, 297.) In the Summer of 2003, the police responded to the community complaints by issuing a zero tolerance policy towards any violations that occurred with respect to activities at Copperfields and the police advised Graziano that they were stepping up enforcement in the area around the bar because of several complaints by residents and people on that block about activities at the bar. (Tr. 344-53.)

The Grahams testified that, over the course of several years, Graziano sought to intimidate them and retaliate against them because of the problems they were causing by their complaints about the activities at the bar. For

---

[1] For example, on the night of March 17, 2000, a Copperfields patron broke the front window of Roseanne's. (Trial Transcript ("Tr.") 144-47.) Also, on October 24, 2000, Joseph Graham arrived at Roseanne's in the morning to find that his telephone wires and the lines to his lottery

terminal had been cut, which he reported to the police. (Tr. 147-48.)

example, Anna Graham testified that, in September 1999 after the Grahams complained to the police about a drunken man on a motorcycle throwing his helmet through their store window, Graziano came to the store and pointed a gun at her and told her to stop complaining at the bar. (Tr. 284-86.) Ms. Graham also testified that, in April 2000, Graziano again came to the store, pointed a gun at her, told her to stop complaining about the bar, and threatened to harm her husband. (Tr. 288-92.) Ms. Graham further testified that Graziano made similar threatening comments on other occasions. (Tr. 293.)

In the Summer of 2003, Graziano spoke approximately three or four times with Morrow, who was a Copperfields patron, about the problems Graziano was having with the Grahams because they were "calling the police on his bar" and "it was hurting his business."[2] (Tr. 530.) During one of these conversations, Graziano asked Morrow if Morrow "could do anything for him about it." (Tr. 531.) Graziano pointed to the security cameras at Roseanne's and explained to Morrow that Graziano could not get one of his friends to do something because they would be caught on camera and it would be linked to Graziano. (Tr. 531.) Morrow told Graziano, "If I go into the store and I grab ahold [sic] of him, he will only call the cops on me, and I'll

get arrested." (Tr. 531.) Because Morrow did not see how he could assist Graziano in some type of retaliation, he told Graziano, "[T]here is nothing I can do for you." (Tr. 531.) The conversation ended and the possibility of an arson was not discussed during the conversation.

However, after thinking about it further on his own, Morrow came up with the idea that he could set a fire at Roseanne's. (Tr. 532.) Before any discussion about that idea with Graziano, Morrow recruited Norman to help him set the fire. Morrow did not tell Norman the name of the business or explain to him how they were going to set the fire. (Tr. 452-54, 534-35.) According to Norman, Morrow told him it would be a "torch job" without further elaboration, which Norman understood as a "fire thing." (Tr. 453.) On or about August 8 or 9, 2003, Morrow returned to Copperfields and told Graziano that he had a "solution" to Graziano's problem and could "help him out" by starting a "small fire" at Roseanne's.[3] (Tr. 536.) Without any elaboration on what Morrow meant by "small fire" or any discussion about the method Morrow would use to set the small fire, Graziano told Morrow to do it and agreed to pay him $1,000. (Tr. 536-37.) Graziano also asked when it would be done and Morrow told him within two or three days. (Tr. 537.) Morrow never discussed with Graziano that Morrow planned to have another individual, Norman, assist him in

---

[2] Graziano knew Morrow as a patron at Copperfields and they first met in 2001, when Graziano caught Morrow using cocaine in Copperfields's bathroom. (Tr. 523.) During 2001, Morrow was a regular customer at Copperfields and would come to the bar "high" on narcotics and sometimes would be involved in fights at the bar. (Tr. 525.) During much of 2002 and early 2003, Morrow did not frequent Copperfields due to his participation in a drug rehabilitation program. (Tr. 525-26.)

[3] Although not discussed with Graziano, Morrow believed in his mind that the fire would be small because it could be extinguished quickly by the volunteer fire department, which was in close proximity to Roseanne's. (Tr. 190-91, 536.) Morrow's intent, which he also failed to discuss with Graziano, was to damage the store enough so the Grahams "wouldn't be able to keep working the card store and bothering Mr. Graziano." (Tr. 537.)

setting the small fire and Graziano had never met Norman. (Tr. 468, 537.) Other than this single conversation with Morrow, there was no evidence that Graziano had any other discussions with Morrow or anyone else about the arson prior to its occurrence.

On the evening of August 10, 2003, Morrow picked up Norman and they drove to Brooklyn, where they bought and used heroin. (Tr. 538.) In the early morning hours of August 11, 2003, after waiting several hours because Morrow was too intoxicated and "high" to even drive, they began heading back towards Nassau County. (Tr. 539-40.) They stopped at a gas station where Morrow retrieved a red, plastic gas cannister from the trunk of the car and filled it with gasoline. (Tr. 455-58, 540.) At about 4:00 a.m., they arrived in the car at Roseanne's where they parked around the corner. (Tr. 540-41.) Morrow and Norman then put on hooded sweatshirts. (Tr. 462.) Morrow pulled the container out of the trunk of his car with gas and realized that he needed some type of fuse, so he found a piece of rag in the back of the car and put it in the throat of the container. (Tr. 463.) Morrow then gave Norman the container and told him to light it and throw it into Roseanne's after Morrow broke the store's window. (Tr. 463.) They started to walk towards the store, but realized that they did not have anything to break the window, so they found a rock by a house. (Tr. 463.) After getting the rock, they walked in front of Roseanne's, Morrow threw the rock through the store's front window, Norman lit the protruding rag from the container, and Norman then threw the flaming container inside the store. (Tr. 463-64.) The gas can, as described by Morrow, "went through the window like a big ball of flames, started a major fire." (Tr. 543.) Morrow and Norman fled the scene immediately. (Tr. 464, 543.)

The surveillance cameras inside Roseanne's captured video footage of the arson at approximately 4:37 a.m. on August 11, 2003, and depicted the following sequence of events over an approximately 20-second span: (1) Morrow and Norman approaching the store; (2) Norman lighting the rag protruding from the gas container; (3) Morrow throwing the rock through the front window; (4) Norman throwing the flaming gas cannister through the window; and (5) smoke and flames immediately erupting from the window area and obscuring the camera view as Morrow and Norman left the scene. (Tr. 127; GX 23.)

Morrow, after dropping Norman off, returned to Copperfields and saw Graziano in the middle of the street, with fire and police personnel. (Tr. 544-45.) Morrow walked up to Graziano and told him he needed to be paid. (Tr. 545.) Graziano, without discussion about the incident, told him to come back in an hour or two. (Tr. 545.) As instructed, Morrow returned approximately one and one-half hours later and was directed to the rear entrance of Copperfields. (Tr. 546.) Graziano met Morrow at the rear entrance, shook Morrow's hand, and Morrow took the money that was inside Graziano's hand during the shake. (Tr. 546.) The only statement by Graziano during the payment of the money was to call Morrow a "crazy motherf***er," to which Morrow replied that he was not crazy and that it was "just business." (Tr. 547.) Morrow left and they never discussed the incident thereafter. (Tr. 547.)

With respect to the physical evidence, investigators retrieved the remains of a plastic gasoline container inside Roseanne's (Tr. 65, 69; GX 4.) The area surrounding the container, which was the origin of the fire, was particularly devastated. (Tr. 73; GX 14.) The

remains of the plastic container were red and the letters "GA" were visible on the outside of the container. (Tr. 82; GX 30.) The remains of a towel also were recovered from inside Roseanne's. (Tr. 83; GX 31.) Both the remains of the plastic container and the towel tested positive for the presence of gasoline. Inspector Whittaker testified that a K-9 reward dog, who is trained to signal whenever she smells an accelerant such as gasoline, signaled in three spots: one outside Roseanne's, one in the display window area, and one at the origin of the fire inside the store. (Tr. 59-60.) Inspector Whittaker also testified that the store's front facade – consisting largely of non-combustible materials, including brick, glass, and metal – remained largely intact, despite the substantial devastation to the inside the store. (Tr. 64, 68; GX 2.)

In terms of use and impact of the device, Explosives Expert Guerrero testified that, based upon his review of the evidence, the device – consisting of a plastic container filled with gasoline, with a cloth wick stuffed in the throat of the container – was lit, thrown into Roseanne's, impacted, ignited combustibles in the area on impact, and, when the container melted and the gasoline dispersed, it caused acceleration of the fire. (Tr. 111-13.) Guerrero testified that the device was used as a weapon because it was thrown into Roseanne's to cause property damage. (Tr. 113-14.) Guerrero conceded that the components of the device – a container full of gasoline and a cloth rag – are not themselves illegal. (Tr. 114.)

B. The Verdict and Rule 29 Motion

At the close of the government's evidence, Graziano moved, pursuant to Rule 29, for a judgment of acquittal on all counts based upon insufficient evidence. In particular, with respect to Count Three – namely, using a destructive device – Graziano argued that there was insufficient evidence to sustain a conviction under *Pinkerton* because the government's evidence could not rationally support a finding by the jury that it was "reasonably foreseeable" to Graziano that Morrow would use a "destructive device," such as an incendiary bomb, to set a small fire at the store. (Tr. 778-80.) The Court denied the motion as to Counts One and Two, but reserved decision on Count Three under Rule 29(b) and allowed the count to be submitted to the jury.

On March 5, 2008, the jury returned a verdict of guilty on all three counts. Following the jury's verdict, the defendant renewed his motion and the Court again reserved decision on Count Three to give the parties time to submit briefs on the issue. On March 26, 2008, defendant filed his memorandum of law for an acquittal as to Count Three under Rule 29. On April 18, 2008, the government filed its opposition to that motion. Defendant's reply was filed on April 30, 2008. Oral argument was held on June 20, 2008.

II. LEGAL STANDARD

Pursuant to Rule 29(a), a district court shall enter a judgment of acquittal as to "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). However, as set forth below, "'[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient.'" *United States v. Lorenzo,* 534 F.3d 153, 159 (2d Cir. 2008) (quoting *United States v. Cruz,* 363 F.3d 187, 197 (2d Cir. 2004)); *accord United States v. Pipola,* 83 F.3d 556, 564 (2d Cir. 1996) (citing *Glasser v. United States,* 315 U.S. 60, 80 (1942)); *see*

*also United States v. Tillem,* 906 F.2d 814, 821 (2d Cir. 1990) (stating that motions to challenge sufficiency of evidence "rarely carry the day").

The standard under Rule 29, as articulated by the United States Supreme Court, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *accord United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008); *Lorenzo,* 534 F.3d at 159; *United States v. Irving,* 452 F.3d 110, 117 (2d Cir. 2006); *United States v. Temple,* 447 F.3d 130, 136 (2d Cir. 2006). In other words, "'[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Temple*, 447 F.3d at 136 (quoting *United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted)).

It is important to emphasize that, in evaluating the evidence under this standard, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003); *see also United States v. Florez,* 447 F.3d 145, 154-55 (2d Cir. 2006) ("In assessing sufficiency, we are obliged to view the evidence in its totality and in the light most favorable to the prosecution, mindful that the task of choosing among permissible competing inferences is for the jury, not a reviewing court."); *Guadagna*, 183 F.3d at 130 (holding that court must bear in mind that Rule 29 "does not provide [it] with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury") (internal quotation marks omitted; alterations in original).

Therefore, viewing the evidence in the light most favorable to the government means "drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Arena,* 180 F.3d 380, 391 (2d Cir. 1999) (internal quotation marks omitted); *accord United States v. James,* 239 F.3d 120, 124 (2d Cir. 2000) ("[T]he credibility of witnesses is the province of the jury, and [a court] simply cannot replace the jury's credibility determinations with [its] own."). In examining the sufficiency of the evidence, the court also should not analyze pieces of evidence in isolation, but rather must consider the evidence in its totality. *See United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir. 1993); *see also Guadagna,* 183 F.3d at 130 (holding that sufficiency test must be applied "to the totality of the government's case and not to each element, as each fact may gain color from others"). Finally, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" *Lorenzo,* 534 F.3d at 159 (quoting *Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004)); *see also Irving,* 452 F.3d at 117 ("A jury may convict on circumstantial evidence alone."); *accord Jackson,* 335 F.3d at 180; *United States v. Martinez,* 54 F.3d 1040, 1043 (2d Cir. 1995). However, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312

F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted); *accord United States v. Cassese,* 428 F.3d 92, 99 (2d Cir. 2005).

In short, "'[w]here a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" *Temple,* 447 F.3d at 137 (quoting *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir. 2000)) (internal quotation marks omitted; alteration in original). On the other hand, "'in passing upon a motion for a directed verdict of acquittal, . . . if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted.'" *Temple*, 447 F.3d at 137 (quoting *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir. 1972)).

## III. ANALYSIS

### A. The "Destructive Device" Element

Graziano argues that the device used to commit the arson – namely, a plastic can containing gasoline with a cloth rag protruding as a fuse – cannot constitute a "destructive device" under Title 18, United States Code, Section 921. As set forth below, the Court disagrees and concludes, based upon the evidence in this case, that the device qualifies as a "destructive device" under the applicable statutory definition. Neither the plain language of the statute, nor the case law applying that language, supports defendant's strained interpretation of the statute as applied to this case. Thus, there is no basis for a judgment of acquittal on that ground.

As a threshold matter, the plain language of Title 18, United States Code, Section 921(a)(4) does not require that a "destructive device" be an explosive. Specifically, Section 921(a)(4) provides, in relevant part, as follows:

> (4) The term "destructive device" means –
> (A) any explosive, incendiary, or poison gas –
> (i) bomb,
> ***
> (vi) device similar to any of the devices described in the preceding clauses;
> (C) any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled.
> The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon . . . .

18 U.S.C. § 921(a)(4). It is abundantly clear from the language of the statute that not every bomb need be an explosive because the word "bomb" is modified by three different adjectives: namely, "explosive, incendiary or poison gas." In other words, if "bomb" is interpreted to be synonymous with "explosive," such an interpretation renders the terms "incendiary" and "poison gas" superfluous. Moreover, the use of the disjunctive term "or" between these terms clearly demonstrates that Congress intended to create three different categories of destructive devices — explosive bomb, incendiary bomb, or poison gas bomb. In short, the Court concludes that, under Section 921(a)(4), an

"incendiary bomb" can constitute a "destructive device" even if it is not an explosive.

However, the Court recognizes that the simple use of incendiary materials (such as gasoline) by an individual does not automatically transform such materials into an "incendiary bomb"; rather, the term "bomb" clearly suggests that something more is required. Specifically, it suggests that the device must be designed to disperse incendiary material on ignition, impact and/or detonation. This is supported by the plain, ordinary meaning of the term "bomb" and "explode." *See United States v. Santos,* 128 S. Ct. 2020, 2024 (2008) ("When a term is undefined, we give it its ordinary meaning."); *see also William L. Rudkin Testamentary Trust v. Comm'r of Internal Revenue,* 467 F.3d 149, 152 (2d Cir. 2006) ("'We give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.'"); *Green v. City of New York,* 465 F.3d 65, 78 (2d Cir. 2006) ("Statutory analysis begins with the text and its plain meaning, if it has one."). For example, in Merriam-Webster Online Dictionary (which was cited by defendant), a "bomb" is defined as "a container of explosive or incendiary material, designed to explode on impact or when detonated by a timer or remote-control." Merriam-Webster Online Dictionary (2008), http://www.merriam-webster.com/dictionary/bomb. Thus, under this definition, it is not critical that a bomb contain explosives, but rather that it be capable of exploding. Although defendant urges the Court to use a definition of "explode" that is limited to devices that can shatter or break apart on impact, such an narrow interpretation of "explode" is contrary to its plain meaning.

For instance, the Merriam-Webster Dictionary online defines "explode" broadly as meaning "to burst forth with sudden violence or noise from internal energy as **a**: to undergo a rapid chemical or nuclear reaction with the production of noise, heat, and violent expansion of gases . . . **b**: to burst violently as a result of pressure from within." Merriam-Webster Online Dictionary (2008), http://www.merriam-webster.com/dictionary/explode. Therefore, using the common meaning of these terms, "an incendiary bomb" is simply any container or device that contains an incendiary material that is designed to be dispersed in a violent or rapid manner upon ignition, impact, and/or detonation, including in the form of heat or fire.[4]

---

[4] This analysis, although reaching the same result, differs slightly from the reasoning of the Tenth Circuit in *United States v. La Cock,* 366 F.3d 883 (10th Cir. 2004). In *La Cock,* the court held that a device that "was designed, upon activation, to shoot a six-foot-high flame into the air and in the process 'gives out large amounts of gas, heat, [and] energy'" constituted an "incendiary bomb" under 28 U.S.C. § 5845. In reaching this decision, the court stated that, under the statute, a "bomb" need not explode because such an interpretation would render "incendiary" surplusage. *Id.* at 888. The court further noted that, "[i]n the flame-producing manner of its operation, the device is similar to a Molotov cocktail or other types of firebombs that have been held to constitute 'incendiary bombs,' even though they do not explode." *Id.* (collecting cases). However, the *La Cock* Court overlooked the fact that "explode" does not only mean to detonate or shatter, but rather is more broadly defined to include any sudden burst of energy, including heat or fire. Therefore, Molotov cocktails, and other firebombs (including the device in *La Cock* and the instant case) do "explode" by delivering a sudden burst of fire and heat from its container upon ignition, flight and impact. In other words, although this Court (unlike *La Cock*) concludes that all "bombs" are designed to

In the instant case, the proof at trial overwhelmingly established that the device used by Graziano's co-conspirators to start the fire at Roseanne's was an incendiary bomb. In particular, the evidence established – through the testimony of Morrow and Norman, the surveillance video of the arson, the physical evidence recovered after the fire, and the testimony of the fire investigator and the ATF expert – that the fire was caused by a gasoline-filled, plastic container, which was ignited by lighting a cloth rag stuffed in the throat of the open can and then thrown through the front window of Roseanne's. This is without question an "incendiary bomb" under Section 921(a)(4). The device was clearly designed to have the gasoline, upon the container's ignition, flight, and impact in the store, spill and disperse in a violent and rapid manner from the open top of the container, thereby having the fuel ignited over a large area and accelerating the fire in the store. This precise function of the device is fully reflected in the surveillance video of the arson which shows that, almost immediately after Norman threw the lit container into the store, flames and smoke engulfed the front area of the store and obscured the view from the surveillance cameras. (GX 23.) Morrow further corroborated this fact during his testimony in which he stated that he saw the device go through the window like a "big ball of flames," starting a "major fire," even though he fled almost immediately. (Tr. 543.) In short, where an open container filled with gasoline with a cloth wick protruding from its throat is ignited and hurled into a building to cause a fire, it clearly qualifies as an

"incendiary bomb" and, thus, as a "destructive device" under Section 921(a)(4).

Although the Second Circuit has never addressed this precise issue, this Court's above-referenced definition of an "incendiary bomb," as well as its conclusion that the device in this case qualifies as such, is completely consistent with decisions by numerous courts in other circuits that have found various types of home-made, incendiary devices to constitute "destructive devices."[5] *See, e.g., La Cock*, 366 F.3d at 888 (holding that homemade device in

---

[5] The Court notes that some of these cases involved the interpretation of the term "destructive device" found in 28 U.S.C. § 5845(f), rather than Section 921(a)(4). Although the definition of "destructive device" is identical in each statute, the statutory frameworks are not identical. In particular, Section 5845(f) requires registration of certain firearms, including destructive devices, and thus deals specifically with possession of unregistered devices. Section 921(a)(4), as applied to Section 924(c) charges, such as the one in the instant case, deals not simply with possession, but criminalizes the use of the destructive device (or carrying or possession) *only in relation to a crime of violence or a drug trafficking case*. Therefore, given that Graziano is charged with such use in relation to a crime of violence within the statutory framework of Section 924(c), the applicability of certain case law under Section 5845(f) cited by defendant, which narrowed the definition of destructive device as utilized under Section 5845(f) in certain respects because of concern of unwitting possession of unregistered materials by individuals with lawful purposes, is highly questionable (despite the identical definitions) in the context of Section 924(c). In any event, even assuming that the Section 5845(f) cases are directly applicable to the Section 921(a)(4) definition and its accompanying statutory framework (or at a minimum are instructive), those cases also support the device in this case qualifying as a "destructive device" for the reasons discussed *infra* and have been cited by the Court.

---

"explode," all these incendiary devices fall within the general definition of the term "explode" and, thus, are incendiary bombs under the statute.

a box that "was designed, upon activation, to shoot a six-foot-high flame into the air and in the process 'give out large amounts of gas, heat [and] energy' constitutes a "destructive device"); *United States v. Hedgcorth,* 873 F.2d 1307 (9th Cir. 1989) (holding that devices, which consisted of plastic water jugs filled with gasoline, motor oil, and soap to produce a gelatinous mixture chemically equivalent to napalm, and used in automobile firebombings, were "destructive devices"); *United States v. Buchanan,* 787 F.2d 477, 483-84 (10th Cir. 1986) (affirming conviction where homemade device consisted of a plastic milk container filled with gasoline and charcoal fluid with a fuse made out of rags, which was lit and dropped through a broken window of a mobile home); *United States* v. *Neal,* 692 F.2d 1296, 1303-04 (10th Cir. 1982) (affirming conviction for possession of a "destructive device" made from "a one gallon plastic jug, flammable liquid, and a rag wick," which was lit and thrown through the window of a home); *United States v. Campbell,* 685 F.2d 131, 132 (5th Cir. 1982) (sustaining indictment for possession of a "destructive device" which was "made from cloth rags, [and] flammable liquid with a fuse made of incense sticks"); *United States v. Ragusa,* 664 F.2d 696, 699-701 (8th Cir. 1981) (upholding conviction under Section 5845(f) and finding that a device consisting of six trash bags, each holding a five gallon container of gasoline, suspended in various locations throughout the house and connected by overlapping paper towels, constituted an "incendiary . . . bomb" or "similar device"); *United States v. Peterson*, 475 F.2d 806, 811 (9th Cir. 1973) (upholding conviction and finding that device consisting of flare segments, black powder, cotton rope, and binding tape, when combined with "evil

intent," is similar to a Molotov cocktail).[6]

Graziano makes several arguments in support of his position, all of which are unpersuasive. First, Graziano obviously acknowledges that a classic Molotov cocktail – usually consisting of a glass bottle filled with combustible liquid and a fuse (such as a cloth wick), which is thrown – constitutes a destructive device under Section 922(a)(4). (*See* Defendant's Memorandum of Law, at 6-7 (discussing Molotov cocktails); *see also United States v. Cruz,* 492 F.2d 217 (2d Cir. 1974) (holding that Molotov cocktails are "destructive devices" and defining a Molotov cocktail as "a 'crude hand grenade made of a bottle filled with a flammable liquid (as gasoline) and fitted with a wick or saturated rag taped to the bottom and ignited at the moment of hurling'") (quoting Webster's Third New International Dictionary 1456 (3d ed. 1961)).) However, Graziano argues that the device in this case stands in "stark contrast" to

_____

[6] Although defendant relies on *United States v. Reed,* 726 F.2d 570, 576 (9th Cir. 1984), that case is distinguishable from the instant case. In *Reed,* the court found that paper-wrapped gasoline-filled beverage cans with holes punctured in the tops were not incendiary bombs nor designed as weapons because they could not have been safely lit or thrown in that they would have been too dangerous to hold. *Id.* at 576. The cans were not in fact used as weapons, but simply possessed. *Id.* As an initial matter, the Court disagrees with the analysis in *Reed* to the extent it can be read to suggest that only devices that are thrown are capable of being weapons and qualify as destructive devices. In any event, *Reed* is distinguishable from the instant case because here, unlike in *Reed*, the device could be – and, in fact, was – thrown and used as a weapon. Therefore, there is no question of the device's ability to be used a weapon and *Reed* provides no support for defendant's position.

a Molotov cocktail and is not a "destructive device" solely because Morrow used a plastic container, which cannot shatter on impact, as opposed to the customary glass bottle. (Defendant's Memorandum of Law at 7.) The Court disagrees with this analysis and does not view the type of container used as dispositive. In his opposition, the defendant accurately explains how the traditional Molotov cocktail using a glass bottle operates: "When it impacts an object, it explodes and shatters, and the droplets of fuel expelled into the air are ignited by the fuse. These tiny drops of fuel are scattered over a wide area in a very short time due to the force of the impact and explosion. The destructive potential of a Molotov cocktail exists, not because it can start a fire, but because the fuel is ignited in the air and scattered over a large area." (Defendant's Memorandum of Law, at 7.) Although Morrow's device would have been more effective with the traditional use of a glass container, his decision to use a plastic container as the delivery device does not remove it from the statutory contours of a "destructive device." Most of the characteristics of a Molotov cocktail still existed with Morrow's device – namely, when one lights an open container of gasoline and throws it, droplets of fuel are expelled in the air during flight and ignited (creating a ball of fire as seen by the videotape of the arson introduced into evidence) potentially covering a large area and, when the container eventually hits the ground, the droplets of gas disperse further out of the open mouth of the container, again scattering the gas over a large area. (Tr. 113-14.) In other words, a Molotov cocktail is designed to release gasoline quickly over a large area which vaporizes and burns, which was the same purpose of the device in this case. The use of a plastic – rather than glass – container does not eliminate this impact; rather, it simply makes it potentially less potent and effective than it otherwise might be. A number of other courts have concluded that similar homemade bombs utilizing plastic containers are "destructive devices." *See Hedgcorth,* 873 F.2d at 1310 (plastic water jugs); *Buchanan,* 787 F.2d at 483-84 (plastic milk container); *Neal,* 692 F.2d at 1303-04 (plastic jug). Thus, despite the plastic container, the device was clearly designed to disperse the fire in a violent and rapid manner during flight and impact, and thereby qualifies under the Section 924(a)(4) definition.

Graziano's related argument that it cannot be a "destructive device" because it did not work well in this case is similarly flawed. Graziano points to testimony by the government's experts that suggests that most of the gas did not escape from the plastic can immediately on impact through the open mouth, but rather the gasoline spread after the container melted. (Tr. 113.) As a threshold matter, there is no question that the device, even if it did not work as quickly as it might otherwise have been capable and was not well-designed, was highly destructive in its effect – that is, the entire store was destroyed. In any event, if the device were designed and intended to mirror the impact of a Molotov cocktail but was unsuccessful because of its crude, unprofessional assembly and/or other unknown factors (such as not throwing it hard or far enough to disperse the gas out of the mouth of the plastic container on flight and impact, or placing too much cloth in the mouth of the container which blocked the dispersal) – it still qualifies as a destructive device. As the Eighth Circuit noted in *Ragusa,* "it is not necessary that the device actually function as intended." 664 F.2d at 700; *see also Hammond,* 371 F.3d at 781 ("[T]he statute does not require the design of an explosive device be 'professional.' . . . Nor is there any

requirement that the device be successful.) (citations omitted); *Evans*, 526 F.2d at 707 ("The statute apparently does not require that a device be successfully detonated before it can be considered a bomb."); *United States v. Markley,* 567 F.2d 523, 526-27 (1st Cir. 1977) ("The statutory purpose would be ill-served by an interpretation which excluded from coverage 'home-made' bombs."). Here, the failure of the device to function exactly as intended does not support finding that it was not a "destructive device" under the statute.

Finally, the Court rejects Graziano's argument that "a gas can with a rag can be found in any garage, has legitimate social purposes, and is thus not a *per se* weapon by design."[7] (Defendant's Memorandum of Law, at 13.) The fact that an incendiary bomb is made from household items with legitimate social purposes does not exempt it from the definition of "destructive device."[8] Instead,

when household components are assembled or re-assembled with the intent to convert them into a destructive device, the statute is implicated. Therefore, in the instant case, there is no question that separate household items – a plastic container, gasoline, and a rag – were assembled with the intent to convert them into a destructive device. The evidence of intent in this case is irrefutable based upon the undisputed evidence that the assembled parts were hurled through a store window to cause an arson after the rag (assembled as a fuse) was lit. Under such circumstances, this device consisting of assembled household items is clearly a "destructive device." *See, e.g., United States v. Campbell,* 685 F.2d 131, 132 (5th Cir. 1982) ("Home-made fire bombs are 'destructive devices,' even though their components may all be legally possessed . . . nor does it matter, in logic, whether the home-made bomb is compact and easily transported or one of dispersed nature, assembled on particular premises to accomplish their ruin.") (citation omitted); *United States v. Curtis,* 520 F.2d 1300, 1304 (1st Cir. 1975) ("The statutory purpose [of Section 5845(f)] would be ill-served by an interpretation which excluded from coverage 'home-made' bombs having no lawful use simply because one of the components was dynamite, a material not in itself regulated as a firearm. Thus, while gasoline, bottles and rags all may be legally possessed, their combination into the type of home-made incendiary bomb commonly known as a Molotov cocktail creates a destructive device.").

Graziano's reliance on the Second Circuit decision in *United States v. Posnjak*, 457 F.2d 1110 (2d Cir. 1972), in support of his argument that intent cannot be considered, is misplaced.

---

[7] As an initial matter, although a gas container filled with gasoline certainly has legitimate purposes and could be found in any garage, it is entirely unclear to the Court what "legitimate social purpose" there would be to stuff a cloth rag in an open gas container and have it protrude from the open top. In any event, even assuming *arguendo* it could have some "social purpose" as asserted by defendant, such purpose does not exempt the device in this case from the statutory definition, for the reasons discussed *infra*, in light of how this device was assembled, as well as its intended and actual use.

[8] Graziano's strained interpretation of the statutory language, as discussed during a hypothetical at oral argument, would lead to the absurd conclusion that, if a person took explosives, put them in a suitcase with some type of fuse, and ignited the fuse at an airport, the person would not be guilty of using a "destructive device" because the device consisted of household items. Despite defendant's contention to the contrary, such a

---

device, assembled and used in that manner, clearly falls within the ambit of the statute.

In *Posnjak*, the Second Circuit held that simple possession of commercial blasting dynamite, even if there is intent to re-sell it for use as a weapon, does not transform the dynamite into a "destructive device" under Section 5845, such that it needs to be registered when possessed under the National Firearms Act. The Court concluded that, because commercial dynamite alone cannot be a "destructive device" and it would have to be assembled with something else to qualify, the intent of the person possessing the dynamite is irrelevant to the definition.[9] *Id*. at 1116-17. However, the Court also made clear that, when the household items have been assembled in a manner that may be used legitimately but also could be used as a "destructive device," intent may be considered under subsection (C) of the "destructive device" definition, which refers to "any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A)." 18 U.S.C. § 921(4)(C). In fact, in explaining that intent could be considered in these ambiguous situations when a device is assembled or re-assembled, the Second Circuit cited a case involving the assembly of a Molotov cocktail as an example where intent is critical:

> [From the language of subsection (C)] [i]t appears that in some instances this intention to convert a device into an article listed in the statute will be relevant. When it is clear that the assembled device created by combining the components falls within (1) or (2), intent is irrelevant, for the parts are clearly "designed" to convert the device into a destructive device. When it is equally clear that the end product does not fall within one of those categories, the same is true. When, however, the components are capable of conversion into both such a device and another object not covered by the statute, intention to convert the components into the "destructive device" may be important. In United States v. Davis, 313 F. Supp. 710 (D. Conn. 1970) in which the defendant was found with bottles, rags, and a can of gasoline, the question of whether he intended to convert these components into Molotov cocktail, a crude but well-known variety of incendiary bomb, was a central issue.

*Posnjak*, 457 F.2d at 1119. The Court then noted that in the case involving the Molotov cocktail – namely, *Davis* – the defendant "admitted that he intended to construct a Molotov cocktail and bomb factory in New Haven, Connecticut." *Id.* at 1119 n.10. Thus, given such clear evidence of intent, the Court emphasized, "Statutory coverage in that situation may therefore give us few qualms." *Id.* Instead, the Court was concerned that a person who innocently possessed "parts of a bomb in his kitchen, workshop, or garage"

---

[9] Although other circuits have reached a different conclusion, *see United States v. Copos*, 93 F.3d 269, 272-74 (2d Cir. 1996) (discussing split among the circuits), *Posnjak*'s holding regarding commercial dynamite is binding precedent in this Circuit and the Court has adhered to it in this Memorandum and Order, but finds it distinguishable from the instant case for the reasons discussed *infra*.

could be charged with possessing an unregistered destructive device. *Id.* Thus, the Court cautioned that subsection (C) should be "narrowly construed." *Id.*; *see also United States v. Bubar,* 567 F.2d 192, 201 (2d Cir. 1976) (distinguishing *Posnjak* and finding dynamite placed under barrels of gasoline to be a "destructive device" because "[o]nce the components were connected, in however crude a fashion, to form a new entity with destructive capabilities of its own and without a legitimate purpose, an incendiary 'device' within the meaning of s 5845(f) came into being"); *United States v. Johnson,* 152 F.3d 618, 624 (7th Cir. 1998) ("[T]he Second Circuit did recognize in *Posnjak* that when a defendant is charged with possession of the component parts that are susceptible to both violent abuse and beneficent use, the analysis is necessarily more nuanced and may require consideration of intent. This complexity is necessary in order to achieve the statute's objective of protecting the public from destructive devices while permitting use of materials that have a salutary purpose. At times, the possession of certain items, albeit in their unassembled state, nevertheless will make it clear that the items can only be used for a destructive purpose. On other hand, possession of other items will necessarily leave their purpose ambiguous. In the latter circumstance, the intent of the possessor will be very important; criminal liability only attaches when the possessor intended to possess a device for destructive purposes.").

In the instant case, under *Posnjak,* the intent of the user of the device can be considered because the crude device that Morrow assembled with household items – pouring gasoline in a plastic container and placing a rag in the container with part of the rag protruding from the open container – does not have an unambiguous commercial or household purpose. When intent is considered, the proof that Morrow assembled a destructive device is overwhelming, based not only on his testimony as to his intent to use the device to commit an arson (as in *Davis*) but, more importantly, on its *actual use* for such purpose as demonstrated by the videotape introduced at trial.[10] Thus, this is not a situation where someone with a gas container and a rag is charged with possessing a destructive device; rather, it is a case where the evidence indisputably demonstrated that the device was assembled and, in fact, used in an arson as a weapon.[11] The fact that the device's assembly

[10] In fact, the evidence supporting this device being a "destructive device," as well as the evidence negating any potential claim that it was not designed for a weapon, was so overwhelming in this case that neither argument was even argued to the jury during the trial by Graziano's counsel or specifically argued at the close of the government's evidence when the Rule 29 motion was made. Instead, it was argued for the first time in the post-trial Rule 29 motion. Although the government contends that the argument that the device was not "designed for use as a weapon" should have been an affirmative defense and has been waived, the Court has fully considered the defendant's arguments on the merits and concludes, based upon the evidence discussed *supra*, that the government unquestionably proved that the device was designed as a weapon in this case and, thus, the exception to Section 921(a)(4) for such a situation does not apply.

[11] This distinguishes the instant situation from cases cited by the defendant where courts have found the "destructive device" element not to have been met because the device was an otherwise legal object *and* there was no evidence of the user's intent. For example, in *United States v. Hammond*, the court held that a device made and possessed by the defendant which the government's expert characterized as a "firecracker" was not a destructive device and explained the following: "Statutory coverage depends upon proof that a

was quick and uncomplicated does not immunize it from the scope of the statute. Given the assembly and use of this device, this Court, like the Second Circuit, has no qualms about its statutory coverage given the statute's plain meaning.

Accordingly, Graziano's motion for judgment of acquittal on this ground is without merit.

## B. The *Pinkerton* Theory of Liability

Graziano also argues, as a separate and independent ground for vacating the Section 924(c) conviction, that no rational jury could conclude, based upon the proof at trial, that it was reasonably foreseeable to Graziano that his co-conspirator would use an incendiary bomb to set a "small fire," as required under a *Pinkerton* theory of liability. As discussed in detail below, the Court agrees and concludes that Graziano has met the heavy burden required under Rule 29 to overturn the conviction on Count Three.

It is a "fundamental tenet of the law of conspiracy," pursuant to the Supreme Court's decision in *Pinkerton v. United States,* that a defendant can be held criminally liable for the reasonably foreseeable acts of his co-

device is an explosive *plus* proof that it was designed as a weapon. No explosive can constitute a destructive device within the meaning of the statute unless it has this 'plus' factor." 371 F.3d at 780. Here, unlike *Hammond*, the existence of the *plus* factor is unmistakable in that the device was actually assembled and in fact used as a weapon in this case. An open plastic cannister filled with gasoline with a cloth-rag fuse, which is ignited and hurled through the air, is certainly a "device [] inherently prone to abuse" and clearly a destructive device under the statute. *Cruz,* 492 F.2d at 219.

conspirator. *United States v. Vario,* 943 F.2d 236, 240 (2d Cir. 1991). As the Second Circuit has explained, "[t]he *Pinkerton* theory permits criminal liability of a conspirator 'for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the substantive crimes.'" *United States v. Bala,* 236 F.3d 87, 95 (2d Cir. 2000) (quoting *United States v. Romero,* 897 F.2d 47, 51 (2d Cir. 1990)); *see also United States v. Parkes,* 497 F.3d 220, 232 (2d Cir. 2007) (holding that, with respect to *Pinkerton*, "'a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the conspiracy was reasonably foreseeable to the defendant as a consequence of their agreement'") (quoting *Cephas v. Nash,* 328 F.3d 98, 101 n.3 (2d Cir. 2003)); *accord United States v. Wiley,* 846 F.3d 150 (2d Cir. 1988). "Whether a particular substantive crime is foreseeable and in furtherance of the conspiracy is a factual question to be determined by the jury." *United States v. Bruno,* 873 F.2d 555, 560 (2d Cir. 1989). Thus, if the jury first concludes that a conspiracy existed and that the defendant knowingly participated in the conspiracy, the jury must next consider whether a particular substantive crime committed by the defendant's co-conspirators was reasonably foreseeable to the defendant and in furtherance of the conspiracy. *See Bala,* 236 F.3d at 95; *accord United States v. Salameh,* 152 F.3d 88, 149 (2d Cir. 1998); *see also United States v. Shi Yan Liu,* 239 F.3d 138, 143 (2d Cir. 2000) (holding that the jury "could consider a *Pinkerton* theory of liability only if they *first* determined that the charged conspiracy existed, and that defendants were members of it"). Accordingly, given this standard, "a defendant may be guilty of a § 924(c) violation under a *Pinkerton* theory if: (1) the defendant

conspired to commit a crime involving violence or drug trafficking; (2) the § 924(c) offense was committed in furtherance of the conspiracy; and (3) the offense was a reasonably foreseeable consequence of an act furthering the unlawful agreement." *Rosario v. United States,* 164 F.3d 729, 734 (2d Cir. 1998).

Here, there is no question that there was sufficient evidence to support the jury's conclusion on the first two elements – namely, that the defendant conspired to commit an arson and the use of the destructive device by the co-conspirators was in furtherance of the conspiracy. Thus, the sole issue is whether there was sufficient evidence to support the jury's conclusion that the use of the destructive device was reasonably foreseeable to Graziano. As to that issue under *Pinkerton,* "[a]n offense by a co-conspirator is deemed to be reasonably foreseeable if it is 'a necessary or natural consequence of the unlawful agreement.'" *Parkes,* 497 F.3d at 232 (quoting *Pinkerton*, 328 U.S. at 648). In proving reasonable foreseeability, as with all elements, the government is entitled to rely on entirely circumstantial evidence. *See, e.g., United States v. Ruiz,* 105 F.3d 1492, 1500 (1st Cir. 1997) ("Although circumstantial evidence requires an inferential step in its proof, there is no legal distinction between circumstantial and direct evidence in the context of a Rule 29 motion. . . . We recognize that the government's proof may lay *entirely* in circumstantial evidence.") (quotations and citations omitted).

Under this standard, the Second Circuit has routinely upheld convictions under *Pinkerton* for violent acts, such as assaults or murders, that took place during an armed robbery or armed drug deal. For example, in *Parkes,* the Second Circuit found that a

murder during an armed robbery was reasonably foreseeable to the defendant under *Pinkerton* even though the conspirators thought it would be an "easy robbery":

> [The defendant] and the others entered [the victim's] apartment before dawn, with pistols drawn and (variously) kicked in doors, rounded up and physically assaulted residents (including placing a plastic bag over the head of one), and bound them with duct tape. The death of a victim is a natural consequence of a robbery which is premised on the use of overmastering force and violent armed confrontation.

497 F.3d at 232; *see also Bruno,* 873 F.2d at 560 (holding that defendant was liable under *Pinkerton* for use of firearms and assault on undercover DEA agent by his co-conspirators during drug deal where defendant, among other things, "witnessed the use of firearms by his co-conspirators while they were negotiating with [another undercover agent] and that he was himself armed when retreating from [the agent] into the apartment").

Similarly, the Second Circuit has upheld Section 924(c) convictions under *Pinkerton* in robbery or drug conspiracies where, for example, the defendant has some awareness of his co-conspirators use of firearms from conversations, observations, and/or prior interactions. *See, e.g., United States v. Masotto,* 73 F.3d 1233, 1243 (2d Cir. 1996) (upholding Section 924(c) conviction under *Pinkerton* where the defendant, convicted of participation in a RICO enterprise involving several hijacking of trucks, was specifically

aware of his co-conspirators use of guns during truck robberies); *see also Rosario v. United States*, 164 F.3d 729, 735 (2d Cir. 1998) (holding evidence sufficient to support guilty plea to Section 924(c) charge by defendant under *Pinkerton* based on co-conspirators carrying of firearms during drug sales where defendant stated in his plea allocution that there "was a gun" present at the drug transactions).[12]

In the instant case, the Court recognizes that defendant bears the heavy burden on this Rule 29 motion of demonstrating that no rational jury, when the evidence is viewed most favorably for the prosecution, could have concluded that the use of a destructive device by Graziano's co-conspirators was reasonably foreseeable to Graziano. However, Graziano has clearly met his burden under that standard given the proof in this case. In particular, although there is certainly sufficient evidence from which the jury found that Graziano hired a co-conspirator to commit an arson at Roseanne's, there is a complete absence of proof regarding how the arson would be accomplished. As a threshold matter, it is undisputed that defendant was not present when the fire was set, nor was he ever told of the method his co-conspirators would use to start the fire. (*See* Government's Memorandum of Law, at 23 ("As Graziano points out and the government concedes, Graziano was not present when the fire was set, nor was he ever notified explicitly of the method his co-conspirators would use to start the fire.").)[13] In fact, the only evidence in the record regarding any conversation with the defendant regarding the arson consisted of a very brief conversation with co-conspirator Morrow several days prior to the arson. At trial, Morrow provided the following testimony regarding his brief conversation with the defendant:

> Q. What happened when you got to Copperfields?

---

[12] There are also similar cases in other circuits. *See, e.g., United States v. Hodges,* No. 07-2279, 2008 WL 2436150, at *2 (7th Cir. June 17, 2008) (upholding Section 924(c) conviction under *Pinkerton* in bank robbery case where, among other things, defendant met with co-conspirators prior to robbery and the logistics of the operation were discussed, including the use of a gun, and the gun was later used in defendant's presence); *United States v. Allen*, 424 F.3d 1231 (9th Cir. 2005) (upholding Section 924(c) conviction under *Pinkerton* in bank robbery case where, among other things, defendant was present at morning meetings where guns were present and their use was discussed; *United States v. Fonseca-Caro*, 114 F.3d 906, 907-08 (9th Cir. 1997) (*per curiam*) (upholding Section 924(c) conviction in bank robbery case where firearm was carried during earlier, similar transactions involving defendant). Moreover, even in drug cases, some courts have cautioned that it is not reasonably foreseeable in all circumstances that a firearm may be used and, thus, the particular circumstances must be analyzed. *See, e.g., United States v. Dean,* 59 F.3d 1479, 1490 n.20 (5th Cir. 1995) ("We do not go as far as to presume that the presence of a weapon in a drug transaction is always foreseeable."); *United States v. Castaneda*, 9 F.3d 761, 767 (9th Cir. 1993) ("Although courts recognize the nexus between drugs and firearms, there is no presumption of foreseeability, and the burden of proving foreseeability remains on the government. Where a defendant has little or no connection to the predicate drug offense, another conspirator's use of a firearm in relation to the predicate drug offense may, in some fact

situations, be unforeseeable.") (citations omitted).

---

[13] Indeed, at oral argument, the government agreed that the record contains absolutely no evidence that Morrow ever mentioned the possibility of using a Molotov cocktail to Graziano.

A. I got there.  I walked inside. I found Carmine.  I asked him if I could speak to him outside.

Q. Did he agree?

A. Yes, he came outside with me.

Q. When you stepped outside with the defendant, did you anyone else in the immediate vicinity?

A. People like walking around to go in and out of the bar or public places, to their cars, stuff like that.  But nobody was standing with me and Mr. Graziano.  It was just us by ourselves.

Q. What happened next?

A. I started speaking to him about his problem, and I told him that I had a solution, that I could help him out.

Q. What did he say?

A. He asked me what it was, and I told him what it was.

Q. What did you say?

A. I told him there was going to be a small fire.

Q. How did he react to that?

A. He seemed interested.

Q. Why did you say – are you sure that you said *small* fire?

A. Yes.

Q. Why did you say a small fire?

A. Because that's what I was hoping it would be.  Not too far from there is the voluntary fire department, and I figured they would get there very fast and put the place out.  But it would take them long enough that some destruction would be to the store, where they wouldn't be able to keep working the card store and bothering Mr. Graziano.

Q. What did the defendant say when you told him you could do a small fire?

A. He had asked me how much.

Q. What did you say?

A. I told him $1,000.

Q. What did he say?

A. He told me to do it, and then asked me how long – when would it be done.

Q. What did you say?

A. Two to three days.  Three days.

Q. Did you have any further discussion with the defendant?

A. No. He stuck his hand out; I shook his hand. Went to his bar. I got into my car and drove off.

Q. Did you tell him how you were going to start the fire?

A. No.

Q. Did he ask?

A. No.

(Tr. 535-37; *see also* Tr. 587 ("That's what I said to him, *small fire*.").) Thus, not only is there a complete absence of any statements in the sole conversation with the defendant that led to the conspiracy regarding use of a destructive device, the words used by Morrow – namely, that he was going to set "a small fire" – are inconsistent with his later decision (on his own) to use an incendiary bomb to set the fire at night at a stationery store filled with papers, cards, and other flammable materials. There is no other evidence in the trial record, before or after that discussion with Graziano, regarding additional conversations between Graziano and Morrow, or Graziano and anyone else, about the arson.

Of course, the Court recognizes, as noted above, that the government is entitled to rely not only on conversations with the defendant, but also any circumstantial evidence that is available to support the jury's conclusion that the use of a destructive device was reasonably foreseeable. *See, e.g., United States v. Paiz*, No. CR 06-00710 WHA, 2007 WL 2143015, at *4 (N.D. Ca. July 24, 2007) ("Whether the use of fire was reasonably foreseeable to [the defendant] at the time the agreement was made [to destroy her car for insurance fraud]

will depend on the facts and circumstances in the context of the agreement."). However, not only is there no specific circumstantial evidence to support such a conclusion, some of the circumstantial evidence (especially in conjunction with the co-conspirator's use of the word "small fire"), in fact, undermines such a conclusion. First, not only was there no discussion about the method of setting the fire, there was no discussion at all about the structure of the store that would require the use of a destructive device, as opposed to some other method. For example, there was no discussion that the store would be difficult to penetrate and, thus, that Morrow would be required to break the store window and throw something into it. Second, the evidence at trial was that the defendant's bar was located immediately next door to Roseanne's. Although there was testimony about a firewall between the two stores, the close proximity of the defendant's bar to the target of the arson (again combined with Morrow's use of the term "small fire") would not suggest to a reasonable person that Morrow would decide to use an incendiary bomb to set the fire after the defendant approved of the arson. *See, e.g., United States v. Geibel*, 369 F.3d 682, 691 (2d Cir. 2004) (holding that "it was not reasonably foreseeable that inadvertent disclosures to remote tippees were a necessary or natural consequence of this trading scheme" where defendants clearly intended the information to be used discretely by co-conspirators). Third, perhaps the best illustration of the unforeseeeability of Morrow's decision to use a destructive device, given his "small fire" representation to the defendant and the totality of the circumstances, was the statement by the defendant (as recounted by Morrow) when the defendant paid Morrow after the fire. Specifically, Morrow testified to the following momentary exchange with the defendant later on the day of the fire when Morrow showed up

at Copperfield's and the defendant gave him the money:

Q. What happened when you got to the back of Copperfields?

A. There was a driveway that leads to where the bar is, and I seen Carmine standing there, so I walked up to him.

Q. What happened next?

A. He reached out to shake my hand. I shook his hand. There was money inside of his hand, and I took it from him.

Q. Did you see anyone else there, at least in the immediate vicinity?

A. No.

Q. What, if anything, did the defendant say to you?

A. He told me I was a crazy motherf***er.

Q. Those were his words?

A. Yes.

Q. What, if anything, did you say to him?

A. I told him I'm not crazy. I told him it was just business.

\*\*\*

Q. Was there any further conversation between you and the defendant at that point?

A. No, not at all.

Q. Did he ever ask you directly about the fire?

A. No.

Q. Did you ever talk about it directly?

A. No.

(Tr. 546-47.) The nature and substance of that brief exchange suggests that the defendant, rather than expecting the use of an incendiary bomb and a large fire that would logically follow, was shocked at how Morrow had decided to set what he represented would be a "small fire."

In addition, there is no circumstantial evidence regarding prior interactions between defendant and Morrow, or other knowledge possessed by defendant about Morrow and/or arsons, that would have suggested to defendant, even without any specific conversation, that Morrow would reasonably use a destructive device to set a small fire at Roseanne's. For example, there was no evidence that either Morrow or Graziano had ever been involved in any other arsons or had used destructive devices on previous occasions. In fact, Morrow testified that he had no practice setting fires with gasoline before this incident and, when asked why he thought in his mind that throwing a lit can of gasoline into a card store with lots of paper would only result in a small fire, his only explanation was that he knew the fire department was close by and

believed they would get there quickly.[14] (Tr. 589.) Thus, there was no circumstantial evidence about the likelihood of Morrow using a destructive device based on prior interactions with the defendant. The absence of this type of circumstantial evidence places the instant case in sharp contrast to other Section 924(c) cases, discussed *supra*, where *Pinkerton* liability has been found based on circumstantial evidence even in the absence of a specific conversation about firearms.

Although the government argues that there is certain other circumstantial evidence in the record that supports the jury's finding on reasonable foreseeability, the Court finds the government's arguments unavailing. In particular, the government attempts to stack inference upon inference to support the conclusion that it was reasonably foreseeable to Graziano that Morrow would use a destructive device. Given the lack of any conversations with the defendant on the method or device to be utilized, the government's circumstantial inference tree is as follows: (1) it was reasonably foreseeable Morrow would do the arson at night; (2) if it was done at night, it was reasonably foreseeable that he would have to break into the locked store from the front; (3) it was reasonably foreseeable he would be in a hurry because of surveillance cameras; (4) if the arson was done at night and he was in a hurry, it was reasonably foreseeable that he would use an accelerant to start the fire; and (5) if it was night and Morrow needed to break into the store to use an accelerant in a hurry, it was reasonably foreseeable that he would throw a destructive device through a broken window to accomplish the task. (*See* Government's Memorandum of Law, at 25.) As an initial matter, although the government can rely on circumstantial evidence and reasonable inferences, the Court is "'loath to stack inference upon inference in order to uphold the jury's verdict.'" *Ruiz*, 105 F.3d at 1500 (quoting *Valerio*, 48 F.3d at 63-64); *see also United States v. McDowell,* 498 F.3d 308, 314 (5th Cir. 2007) ("Needless to say, to demonstrate sufficiency, the Government 'must do more than pile inference upon inference.'") (quoting *United States v. Maseratti,* 1 F.3d 330, 337 (5th Cir. 1993)). Such multiple inferences are especially problematic when based, in part, upon the private thought process of the co-conspirator that was not communicated to the defendant. For example, although the level of damage to be done to Roseanne's from the small fire was never discussed between Morrow and the defendant, the government argues that Morrow reasonably inferred in his mind that Graziano wanted substantial damage which would close down the store and Graziano should have known that Morrow would infer that and, thus, Graziano should have reasonably inferred that Morrow would use an incendiary bomb (despite saying it would be a small fire). *See* Government's Memorandum of Law, at 28, 30.) These double and triple inferences from circumstantial evidence, involving the uncommunicated thought processes of co-conspirators, are entirely too speculative in this particular case to support the jury's verdict on Count Three.

---

[14] At another point in his testimony, when asked why he used this Molotov cocktail-type device if he only wanted to start a small fire, he responded, "I'm not a professional. It's a little canister just like this. I didn't think it would start a tremendous fire like it did, not with that small an amount of gasoline." (Tr. 553). Later, Morrow was asked, "Is there anything in your experience that made you believe that throwing a lit can of gas into a store with lots of paper in it would result in a small fire." (Tr. 589.) Morrow responded, "No." (*Id.*)

In any event, even if they were not too speculative, a number of these inferences from the circumstantial evidence upon which the government relies do not reasonably point to a foreseeable need to use a destructive device. For example, although it may have been reasonably foreseeable that the arson would take place at night when the store was locked, that does not make it reasonable to assume that a destructive device would be used to set a small fire. To the contrary, there was nothing preventing Morrow from quickly breaking the lock on the front door (or breaking the window), pouring a small quantity of gasoline or other flammable substance on the floor, and igniting it with a match. Similarly, the existence of surveillance cameras that were focused on the sidewalk and door in front of the store did not make it any more likely that a destructive device would be needed because Morrow would be picked up on the camera whether he threw a destructive device through the window, or simply poured gasoline on the floor and ignited it after breaking the store door or the window.[15] In fact, Morrow and his

co-conspirator were caught on the video surveillance throwing the destructive device through the window. Thus, the existence of video surveillance did not make the use of the destructive device more reasonable.

In essence, the government's argument boils done to this – "it is difficult to imagine how else Graziano's co-conspirators could have set fire to a locked, closed business located inside a building constructed of non-flammable materials." (Government's Memorandum of Law, at 23.) However, as noted above, it is very easy to imagine that Morrow, if he wanted to set a small fire, would not use an airborne, incendiary bomb, but rather would opt to break the door or window and pour some small quantity of flammable liquid in the front of the store to cause a small fire with substantial damage.[16] In fact, no rational jury could conclude that, if the stated

_____

[15] It is important to note that, although the defendant did point to the surveillance cameras during a conversation with Morrow, that conversation had nothing to do with committing an arson and occurred prior to Morrow's even first suggesting that he could set a small fire to cause problems for the owners of Roseanne's. As Morrow testified, the defendant mentioned the cameras to explain to Morrow why Graziano could not get his own friends to retaliate against the Grahams, rather than asking Morrow – namely, Graziano believed that if one of his friends did it and was seen on the video, it would come back to Graziano. (Tr. 531.) Thus, the defendant's reference to the surveillance cameras had to do with _who_ would commit the crime, and did not relate to what type of retaliation it would be or how it would be committed. Under those

circumstances, no reasonable inference can be drawn about the need to use a destructive device from the discussion about the cameras aimed at the outside of the store.

[16] For example, a survey of federal and state arson cases reflects the use of this type of method, or a similar method not involving destructive devices, in connection with committing an arson of a store, _see, e.g., Whitton v. State_, 178 Ga. App. 862, 863 (Georgia App. 1986) (arson of a store at 1:00 a.m. committed by pouring gas under the rear door and down the back stairs and lighting it with a match); _Pace v. State_, 473 So.2d 167, 168 (Miss. 1985) (arson of competing saloon committed by pouring gas down the center attic ventilator shaft and igniting it), or a home, _see, e.g., Tavrin v. State_, 277 Ga. 509, 509-10 (Ga. 2004) (arson of home by pouring gasoline on back door of victim's house and igniting with a burning cigarette); _Odom v. Bruno,_ No. 91 Civ. 7273 (KTD), 1994 WL 132286, at *1 (S.D.N.Y. Apr. 14, 1994) (arson of apartment by pouring gasoline under the door and igniting it).

goal is to set a small fire under the circumstances of this case, it was reasonably foreseeable to anyone (including defendant) that Morrow would use an incendiary bomb in a store filled with papers and cards to accomplish that goal. Although the government takes issue with defendant's sweeping assertion that "incendiary bombs are not reasonably capable of setting small fires" (Defendant's Memorandum of Law, at 17), the Court believes that the government's argument is misplaced. The Court recognizes that there could potentially be some peculiar situation (which is not present here) where a destructive device, such as a incendiary bomb, could be used to create a small fire in a commercial building, such as if an extremely small quantity of certain type of accelerant were going to be used and the device was placed in a very contained area where the fire would be unable to spread or cause damage. However, the fact that such an unusual situation could theoretically exist does not make it reasonably foreseeable. In other words, the question is not one of mere possibility, but of reasonable foreseeability as a "necessary or natural consequence" of the conspiracy. *See Pinkerton,* 328 U.S. at 648; *Parkes,* 497 F.3d at 232; *see also United States v. Joyner,* 201 F.3d 61, 77 (2d Cir. 2000) (holding evidence insufficient to support *Pinkerton* liability where co-conspirator's "purchase of the handgun in exchange for cocaine was not a 'necessary or natural consequence of the unlawful agreement' or in furtherance thereof"). Here, there is nothing from the brief conversation between the defendant and Morrow or the circumstances to suggest that it would be reasonably foreseeable, as a necessary or natural consequence of defendant's agreement with Morrow to set a "small" fire, that an incendiary bomb would be used. It was certainly not "necessary" because of the other options, referenced above, that were available to Morrow. Moreover, although possible, it is beyond cavil that it would not be "natural" to use an incendiary bomb to create a small fire at a card store. To the contrary, as discussed *supra* in connection with the definition of destructive device, Molotov cocktails and other similar incendiary gasoline bombs (including the one used in the instant case) are traditionally used to set *big* fires by the scattering of fuel droplets that are ignited on flight and/or impact, and instantaneously spread across an extensive area. Thus, it is clear that, under the particular circumstances of this case – where the defendant was told that a small fire would be set – the jury could not rationally conclude, in the absence of any additional proof that this was a unique arson situation, that it was reasonable foreseeable to the defendant that a destructive device would be used.

In fact, after an exhaustive search of cases around the nation, this Court was unable to find a single case where a defendant was convicted of use of a "destructive device" under *Pinkerton* in connection with an arson where there was no discussion about a "firebomb" or some specific need to use such a device to accomplish the arson.[17] In fact, there are only two cases where this issue has arisen and a Section 924(c) "destructive device" conviction under *Pinkerton* was upheld. *See United States v. Abed*, 203 F.3d 822, 2000 WL 14190, at *2 (4th Cir. Jan. 10, 2000) (unpublished opinion); *United States v. Peterson,* 190 F. Supp. 2d 343 (E.D.N.Y. 2002). However, as discussed below, the facts in both cases are readily distinguishable from the instant case. In fact, the proof in both cases

---

[17] At oral argument, the government conceded that it had not found any such cases either and that this was a case of "first impression."

was sufficiently detailed that both courts also found that it was sufficient under an aiding and abetting theory as well.[18]

In *Abed*, the defendant store owner was convicted of having co-conspirators eliminate a competing convenience store, called the Corner Store, by burning it down for a fee of $5,000. 2000 WL 14190, at *2. The co-conspirators then completed the arson by tossing a Molotov cocktail through the back window of the store. *Id.* Defendant argued, among other things, that there was insufficient evidence to sustain his Section 924(c) conviction for use of a destructive device to commit the arson "because the use of a Molotov cocktail was never discussed in his presence and was not reasonably foreseeable." *Id.* at *12. The Fourth Circuit rejected the defendant's argument and found sufficient evidence under an aider-and-abettor theory or a *Pinkerton* theory to support the Section 924(c) "destructive device" conviction based upon several conversations in which, contrary to defendant's assertion, the defendant himself specifically referred to the need to use a Molotov cocktail for the arson in discussions with co-conspirators. *Id.* at *12 (summarizing evidence of conversations with defendant in which defendant specifically told others to use a Molotov cocktail). For example, the court noted that a customer at defendant's store "testified that [the defendant] asked him to burn down the Corner Store 'several times' and told him to use a Molotov cocktail to do so." *Id.* In addition, there was testimony from a co-conspirator that "[the defendant] wanted the Corner Store burned because it was taking away his business from the Speedway Market, that he would pay $2,000

for the job, and that the Corner Store would be burned with a Molotov cocktail." *Id.* Thus, the Fourth Circuit, in an alternative holding, stated that, given those specific conversations, "under a *Pinkerton* theory of liability, it was certainly reasonably foreseeable to [the defendant] that the conspirators would use a Molotov cocktail to burn down the Corner Store and that the destruction of a competitor, the Corner Store, was in furtherance of the conspiracy." *Id.* Unlike *Abed*, there was no discussion in the instant case between Graziano and Morrow regarding the method to conduct the arson, nor (as discussed above) were there any special circumstances that would suggest to a reasonable person that a destructive device would be utilized to set a small fire.

The circumstances in *Peterson* are similarly inapposite. In *Peterson,* the Court held that there was sufficient proof to convict the defendant under Section 924(c) pursuant to *Pinkerton* for using a destructive device to commit an arson, where the defendant hired a co-conspirator to set fire to a retail liquor store. 190 F. Supp. 2d at 347. Although the defendant argued that the conviction must be set aside under Rule 29 because he never told his co-conspirators how to burn the buildings, the Court found sufficient evidence to support a "reasonable foreseeability" finding under *Pinkerton* based upon detailed conversations between the defendant and his co-conspirators about difficulties in penetrating the building:

> The Government established that the defendant William Peterson could have reasonably foreseen that Molotov cocktails would be used in carrying out the arsons at issue. Initially Peterson asked Jesse Hart to burn down Frank's Wine and Liquor Merchants. Hart

---

[18] Here, the government is not seeking to rely on an aiding and abetting theory, but rather is only relying on *Pinkerton*.

testified that the only way he could have set Frank's on fire would have been to go through the roof. As a result, Hart told Peterson that Frank's "was too hard to do." Hart also testified that, in contrast, he told Peterson that Bottle and Cases and Bottle Bargains "were easier to do." With respect to whether it was reasonably foreseeable that Molotov cocktails would be used to ignite the fires, Hart testified that Peterson had cautioned him "that the place on the top of the hill, Bottle & Cases, has bulletproof glass" and "might be difficult, very difficult, to get through." A reasonable jury could find that Peterson was aware that Hart's accomplices would not enter Bottles and Cases and Bottle Bargains through the roof and that the stores' exterior glass would have to be broken. Thus, in order to burn down the store Peterson could have reasonably foreseen that Hart's accomplices, after breaking the glass, would hurl incendiary devices such as Molotov cocktails inside the store.

*Id.* at 354 (citation omitted). Moreover, Hart testified that, at a meeting in the defendant's office, the defendant "said to [Hart] that he had a place that he wanted fire bombed." *Id.* at 351 (quoting trial transcript). Thus, the Court concluded that the evidence of reasonable foreseeability was "compelling" because "[t]he Government adduced direct evidence that Peterson knew that his co-conspirators – directed and paid by him to commit the arsons – would have to break a glass window and inferentially he knew that they would have to throw incendiary devices in through the holes in the glass window." *Id.* at 358. Thus, the proof in *Peterson* is distinguishable from the instant case where there was no discussion about difficulties in penetrating Roseanne's, no discussion about firebombing, and Morrow represented to Graziano that it would be a small fire.

In sum, as the Second Circuit has noted, "*Pinkerton* did not create a broad principle of vicarious liability that imposes criminal responsibility upon every co-conspirator for whatever substantive offenses any of their confederates commit." *Bruno*, 383 F.3d at 65 (quoting *United States v. Jordan*, 927 F.2d 53, 56 (2d Cir. 1991)). The "reasonable foreseability" requirement prevents *Pinkerton* from being unconstitutionally transformed into this broad principle of vicarious liability. Here, considering the evidence in its totality and viewing the evidence in the light most favorable to the government, no rational jury could conclude that it was reasonably foreseeable to Graziano that his co-conspirator would use a destructive device, in the form of an incendiary bomb, to set this small fire at an adjacent store. Accordingly, a judgment of acquittal on Count Three on this ground is warranted.

## IV. CONCLUSION

For the foregoing reasons, the Rule 29 motion for a judgment of acquittal on Count Three is granted. Accordingly, the conviction on Count Three is vacated and a judgment of acquittal shall be entered on that count.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 10, 2008
Central Islip, New York

* * *

The attorney for the Government is Evan Williams, Esq., of the United States Attorney's Office for the Eastern District of New York, 560 Federal Plaza, Central Islip, NY 11722. The attorneys for the defendant are Benedict S. Gullo, Jr., Esq., 114 Old Country Road, Suite 212, Mineola, NY 11501 and Joel R. Weiss, Esq., of Farrell Fritz, P.C., 1320 Reckson Plaza, Uniondale, NY 11556.